ROBERTS, J.,
for the Court.
SUMMARY OF THE CASE
¶ 1. In 1991, Linda Hall began working for Union Camp, a manufacturer of industrial use cardboard boxes. In 1992, Hall injured her left knee as she operated machinery in Union Camp’s plant. In 1994, Hall filed a petition to controvert with the Workers’ Compensation Commission incident to her injured left knee.
¶ 2. In 1999, Hall amended her petition to controvert and claimed that she also suffered a compensable injury to her right knee. Hall claimed that she injured her right knee during her employment because she overcompensated for her left knee. In 2000, Hall attempted to amend her petition to controvert again. Hall claimed she developed chronic obstructive pulmonary disease (COPD) due to her employment.
¶ 3. In 2001, Hall went before an administrative judge for a hearing on all three of her claims. The administrative judge found that Hall was entitled to permanent and total disability benefits for her left and right knees. The administrative judge also found that Hall was not entitled to benefits for her COPD.
¶4. Union Camp appealed to the Full Commission. Hall cross-appealed the administrative judge’s finding that her COPD was not compensable. The Full Commission affirmed the administrative judge’s decision regarding both Union Camp’s appeal and Hall’s cross-appeal. The Chickasaw County Circuit Court affirmed both decisions as well. ■
*366 ¶ 5. Aggrieved, Union Camp appeals and claims the Commission erred (a) when it found Hall’s right knee injury was not barred by the statute of limitations, (b) when it found that Hall’s right knee injury was compensable, and (c) when it found Hall permanently totally disabled. Finding no error, we affirm. Additionally, Hall cross-appeals and claims the Commission erred when it refused to award benefits incident to her COPD claim. Likewise, we find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 6. Linda Hall worked in Union Camp’s manufacturing facility in Houston, Mississippi. Union Camp manufactured industrial cardboard boxes for Thermos and Action Furniture, among others.[1] Hall began working for Union Camp in the summer of 1991.
¶ 7. On September 12, 1992, Hall injured her left knee. According to Hall, “We had a load put on the conveyor behind the [slitter] machine, and it was crooked. I was standing between two conveyors, two little narrow conveyors, and I was trying to straighten the boxes up, and when I did, I twisted my knee.” Hall thought her knee would improve with time, but it did not.
¶ 8. Ten days later, Hall visited Dr. Edward Gore, Union Camp’s company physician. Dr. Gore suspected that Hall tore her meniscus. Dr. Gore told Hall to rest, apply heat, and return for a follow-up appointment in ten days. When Hall returned, her knee had not improved. Consequently, Dr. Gore referred Hall to the Tupelo Orthopaedic Clinic in Tupelo, Mississippi.
¶ 9. Hall followed Dr. Gore’s advice and went to the Tupelo Orthopaedic Clinic, where she met Dr. Alex Bibighaus. Dr. Bibighaus had an MRI performed on Hall’s left knee. According to Dr. Bibi-ghaus, that MRI confirmed that Hall tore her meniscus. On March 5, 1993, Dr. Bibi-ghaus performed arthroscopic surgery on Hall’s left knee and repaired Hall’s torn meniscus.
¶10. On May 23, 1994, Hall filed a petition to controvert with the Mississippi Workers’ Compensation Commission. Hall asserted that she was entitled to compensation based on her left knee injury. Union Camp and Union Camp’s worker’s compensation insurance carrier, Liberty Mutual Insurance Co., filed an answer. Union Camp admitted that Hall sustained an injury, but contested the extent of her injury.
¶ 11. After her December 17, 1996, appointment with Dr. Bibighaus, Hall sought a different physician. According to Hall, she stopped seeing Dr. Bibighaus because “[h]e mentioned surgery, and I didn’t want to have surgery unless I had to.” Hall again went to Dr. Gore for a recommendation. After their January 9, 1997 meeting, Gore recommended Dr. Scott Jones of The Columbus Orthopaedic Clinic in Columbus, Mississippi. Again, Hall followed Dr. Gore’s recommendation.
¶ 12. Dr. Jones first saw Hall on January 27, 1997. During that initial visit, Hall complained of pain in both of her knees. Dr. Jones treated Hall’s knees with anti-inflammatory drugs, physical therapy, and knee injections. As of May 21, 1997, Dr. Jones felt as though Hall reached maximum medical improvement. Dr. Jones concluded that Hall had 20% permanent impairment to each lower extremity and 12% to her body as a whole. Dr. Jones released Hall to return to work with permanent restrictions.
*367 ¶ 13. Hall last saw Dr. Scott Jones during an appointment in June of 1997. According to Hall, she stopped seeing Dr. Scott Jones because she “kept trying to get an appointment with him ... and [she] never could see him.”[2]
¶ 14. Meanwhile, Hall continued to see Dr. Gore. On August 27, 1997, Dr. Gore gave Hall a letter. Hall gave it to Patricia Archer, Union Camp’s personnel manager. That letter stated:
After physical examination in my clinic and speaking with Dr. Scott Jones, orthopedic surgeon, we have decided that Ms. Hall should be placed under the following restrictions in her job: No stooping, no pushing, no climbing, no lifting over 25 pounds if legs are used to lift. These are permanent restrictions. If you have any questions, please call us.”
According to Hall, Union Camp never modified her job according to those restrictions.
¶ 15. Meanwhile, Hall sought treatment from Dr. Gary Vise, another orthopaedic surgeon. On October 23,1997, Hall visited Dr. Vise for the first time. Dr. Vise examined Hall’s right knee and concluded that Hall had “bilateral, pre-existing genu val-gum with a tendency towards osteoarthritis and that this has been exacerbated or aggravated by her work activity.” Dr. Vise found a causal relationship between Hall’s right knee pain and her employment with Union Camp. Dr. Vise advised Hall that she should stop working immediately. Hall never returned to work afterwards.
¶ 16. In the meantime, Hall visited Dr. Gore and complained that she had problems breathing. Dr. Gore gave Hall an albuterol inhaler and referred Hall to Dr. Benjamin Moore, a pulmonologist with the IMA Foundation, Inc. in Tupelo, Mississippi. On July 31, 1998, Hall visited Dr. Moore for an initial evaluation of her breathing problems. Dr. Moore examined X-rays of Hall’s chest, prescribed predni-sone, and told Hall to return for a “pulmonary function study.” Hall returned on September 28, 1998. Dr. Moore performed a pulmonary function study and found that Hall showed “severe obstructive lung disease.” Dr. Moore diagnosed Hall with chronic obstructive pulmonary disease.
¶ 17. As for Hall’s right knee, Dr. Vise’s medical records show that he performed partial knee replacement surgery on Hall’s right knee on October 10, 1998. Dr. Vise felt as though Hall reached maximum medical improvement on her right knee as of January 7, 1999. Dr. Vise concluded that Hall had a permanent partial impairment to her right knee and that the impairment level was 37% for her right knee and 15% as a whole.
¶ 18. On April 14, 1999, Hall filed a motion to amend her petition to controvert. Hall sought to add a claim for her right knee. The administrative judge allowed Hall to amend her petition to controvert and add her right knee claim. Then, on February 17, 2000, Hall filed another motion to amend her petition to controvert. That time, Hall requested that she be allowed to assert a claim that she developed COPD as a result of work-related exposures while she worked for Union Camp.
¶ 19. On January 11, 2001, the parties attended a hearing before the administrative judge. Union Camp stipulated that Hall sustained a compensable injury to her left knee on September 12, 1992. However, Union Camp disputed Hall’s right knee claim and her COPD claim. The adminis *368 trative judge then had the following entered into evidence: (a) Dr. Scott Jones’s deposition, (b) Dr. Vise’s two depositions, (c) Dr. Bibighaus’s deposition, (d) Dr. Riley Jones’s deposition, (e) medical records generated by Dr. Moore’s treatment, (f) Hall’s testimony, (g) testimony from Arthur Burkman, union representative at Union Camp, (h) testimony from Dr. Gore, and (i) testimony from Charles Wright, Union Camp’s environmental safety and health coordinator.
¶ 20. On June 29, 2001, the administrative judge entered her order. The administrative judge found that Hall had com-pensable injuries to her left and right knees. Additionally, the administrative judge found that Hall was entitled to permanent and total disability benefits due to her two knee injuries. However, the administrative judge found the evidence insufficient to conclude that Hall developed COPD as a result of her employment with Union Camp.
¶21. On July 12, 2001, Union Camp appealed to the Full Workers’ Compensation Commission. Hall cross-appealed the administrative judge’s decision that her COPD claim was not compensable. On July 30, 2002, the Full Commission affirmed. The Full Commission stated, “[hjaving heard the arguments offered on behalf of the parties and having thoroughly studied the record and the applicable law, the Commission affirms.”
¶ 22. On August 28, 2002, Union Camp appealed to the Chickasaw County Circuit Court. Again, Hall cross-appealed. After it heard oral arguments, the circuit court affirmed the full commission. Union Camp appeals and Hall cross-appeals to our Court.
STANDARD OF REVIEW
¶ 23. In reviewing appeals from rulings of the Workers’ Compensation Commission, this Court must resolve whether a quantum of credible evidence supports the Commission’s decision. Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1224 (Miss.1997). We may not resolve conflicts in the evidence. Id. at 1224-25. Rather, we presume that the trier of fact, the Commission, resolved all conflicts in evidence. Id. This is a highly deferential standard of review. Id. at 1225. Essentially, we will overturn the Commission if its decision was arbitrary and capricious. Id. We will also overturn the Commission if its decision was based on an error of law or an unsupported finding of fact. Meridian Professional Baseball Club v. Jensen, 828 So.2d 740(¶ 8) (Miss.2002).
ANALYSIS
I. WHETHER THE COMMISSION ERRED WHEN IT DID NOT FIND THAT HALL’S RIGHT KNEE INJURY WAS BARRED BY THE STATUTE OF LIMITATIONS.
¶24. Union Camp submits that the Commission erred when it did not find that the statute of limitations barred Hall’s right knee claim. Union Camp did not raise the statute of limitations at the initial hearing. Instead, Union Camp stated that it was “prepared to proceed on every claim that has properly been made in this case, which is the right knee and the left knee.” Failure to raise the statute of limitations causes the procedural bar to operate. Barnes v. Singing River Hosp. Systems, 733 So.2d 199(¶ 21) (Miss.1999). As such, this issue is procedurally barred.
II. WHETHER HALL PRESENTED SUFFICIENT EVIDENCE THAT HER RIGHT KNEE INJURY WAS CAUSED BY HER EMPLOYMENT.
¶25. As mentioned, the administrative judge found that Hall’s right knee injury was caused by her employment. *369 Specifically, the administrative judge found that Hall:
complained as early as December 17, 1996, of pain bilateral in nature. Of significance is the job description of [Hall] and the duties that were required of her in that position. It was very probative to the undersigned as well that the assertion of Dr. Guy T. Vise, Jr. as to the overuse syndrome is compelling and would appear to have been the cause of her right lower extremity problems and or injuries and significantly pinpointing the right knee area, the combination of the overuse syndrome and the job responsibilities which applied to the claimant’s position resulted in a compensable injury to her right extremity providing a causal connection to the original left sided incident.
¶ 26. In this issue, Union Camp asserts that the Commission erred when it found that Hall’s right knee injury was caused by her employment. According to Union Camp, no testimony indicated that Hall injured her right knee as a result of her employment. Union Camp suggests that Hall injured her right knee due to an innate defect entirely unrelated to her employment.
 ¶ 27. Hall’s injury is compensa-ble if it arose “out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.” Miss.Code Ann. § 71 — 3—3(b) (Rev.2000). To present a prima facie case of compensability, Hall had to prove, by a “fair preponderance of the evidence,” the following elements: (1) she sustained an accidental injury, (2) that arose out of and in the course of her employment, and (3) a causal connection between her injury and her claimed disability. Adams v. Lemuria, Inc., 738 So.2d 295 (¶ 9) (Miss.Ct.App.1999). If Hall presented a prima facie case of disability, the burden to disprove disability shifted to Union Camp. Id.
¶ 28. Union Camp does not dispute that Hall injured her right knee. There is no question that Dr. Vise treated Hall’s right knee or that Dr. Vise felt it necessary to perform partial knee replacement surgery on Hall’s right knee. Additionally, there is no evidence that Hall’s injury was anything but accidental. As to whether Hall’s knee injury “arose from her employment” with Union Camp, Hall testified that she injured her right knee because of her employment at Union Camp. Hall testified that she compensated for her left knee and placed a greater load on her right knee. Dr. Vise corroborated Hall’s testimony. During a deposition, Dr. Vise attributed Hall’s right knee injury to “overuse syndrome.” According to Dr. Vise, because Hall had surgery on her left knee, Hall placed a heavier load on her right knee. However, Union Camp focuses its argument on Hall’s proof of causation.
¶ 29. Proof of causation is sufficient even if it is minimal or reasonably incidental to employment. Id. Employment need not be the sole cause of injury. Id. If Hall’s employment contributed to her condition, the injury is compensable. Sharpe v. Choctaw Electronics Enterprises, 767 So.2d 1002(¶ 13) (Miss.2000).
¶ 30. Union Camp points out that Dr. Scott Jones was of the opinion that Hall’s right knee injury was unrelated to her left knee injury. True enough, when asked during a deposition whether he could say within a reasonable degree of medical probability that there was a causal connection between Hall’s left knee injury and her right knee complaints, Dr. Jones answered, “I don’t see any connection between a twisting injury to her left knee and her complaints I was seeing her for in her right knee.”
¶ 31. Union Camp also notes that, on January 27, 1998, Hall visited Dr. Riley *370 Jones, another orthopaedic surgeon. Dr. Riley Jones examined Hall’s knees. Dr. Riley Jones’s notes reflect:
At the present time I think that the left knee problem is well documented. She had torn meniscus on the left knee which is secondary to her injury; however, she had pre-existing genu valgum in both knees and this has gradually gotten worse. She would like to relate this to her job; however, there has been no injury and I can’t relate this to it. The patient has an underlying problem on both knees of genu valgum. Therefore, she has had increasing stresses, increasing degenerative changes and these have absolutely nothing to do with her job. It would not have mattered if she was working at this place or another place and I have explained that to her. She has no effusion today. No instabilities. This is unfortunately one of the things that is more developmental and the right knee cannot be related to her job. As far as treatment possibilities, she can live with what she has got and I think there is the possibility of her changing jobs and going to something where she doesn’t have to stand all the time. In the future she may well have to have something else done, but at this point her genu valgum and the problem she is having in the right knee are developmental and age process as opposed to being related to her on the job problems.
¶ 32. There is no doubt that Dr. Scott Jones and Dr. Riley Jones were of the opinion that Hall’s right knee injury was unrelated to her employment at Union Camp. If there were no other evidence among the record, there would be no evidence to support the Commission’s decision. However, additional evidence from competent physicians indicated that Hall’s right knee injury was connected to her employment at Union Camp.
¶ 33. Dr. Gore testified that Hall’s right knee injury was causally related to her employment. Hall’s attorney asked Dr. Gore whether he could say within a reasonable degree of medical probability if there’s any causal connection between the right knee injury and Hall’s employment. Dr. Gore answered, “[w]ith continued stress on the knee, if she already had a propensity for injury and arthritis, I think continued wear and tear on the knee would accelerate those problems, so I think it did have an effect on it, yes.”
¶ 34. Union Camp admits that Dr. Gore related Hall’s right knee injury to her employment. However, Union Camp notes that Dr. Gore, a general practitioner, was not board certified in orthopaedies. Union Camp also points out that Dr. Gore testified that Dr. Scott Jones was more qualified to render an opinion as to Hall’s right knee and that Dr. Scott Jones opined that Hall’s right knee injury was unrelated to her employment and unrelated to her left knee injury. Even if we discredited Dr. Gore’s opinion, there is still additional testimony that Hall’s right knee injury was causally related to her employment at Union Camp.
¶35. Dr. Vise concluded that Hall’s right knee had been “exacerbated or aggravated by her work activity.” Dr. Vise found a causal relationship between Hall’s right knee pain and her employment with Union Camp. Union Camp notes that Dr. Vise was the only orthopaedic surgeon to relate Hall’s right knee injury to her employment. While that may very well be, that fact, in and of itself, is not sufficient to discredit Dr. Vise’s medical opinion. Union Camp also seems to claim that Hall’s attorney sent Hall to Dr. Vise so that Dr. Vise could testify that Hall’s right knee injury was work-related. Union Camp points out that Dr. Vise practices in Jackson, Mississippi while Hall lived in Aber *371 deen, Mississippi. Union Camp also notes that there are plenty of qualified ortho-paedic surgeons in Columbus, Tupelo, and Oxford — all of which are in closer proximity to Hall’s home in Aberdeen.
¶ 36. The Workers’ Compensation Act is to be construed liberally in favor of claimants, likewise for paying benefits for a compensable injury. Sharpe, 767 So.2d at (¶ 18). To fulfill the purposes of the Workers’ Compensation Act, we should resolve doubtful cases in favor of compensation. Id. at (¶ 19). Based on the “broad policy considerations undergirding the Workers’ Compensation Act and the liberal construction to be given the compensation statutes,” the injured worker should prevail when the evidence is “even.” Nichols-Banks v. Lenscrafters, 814 So.2d 808(¶ 21) (Miss.Ct.App.2002).
¶ 37. As we mentioned in our standard of review, we are only called upon to resolve whether a quantum of credible evidence supports the Commission’s decision. Hale, 687 So.2d at 1224. There can be no doubt that Dr. Vise’s expert medical opinion supports the Commission’s decision. While it is true that there was a conflict in expert medical opinion, we may not resolve conflicts in the evidence based on our mandated presumption that the trier of fact, the Commission, resolved all such conflicts. Id. Based on our highly deferential standard of review, we find that the Commission’s decision was not arbitrary and capricious, nor was it based on an error of law or an unsupported finding of fact. As such, we must affirm.
III. WHETHER THE COMMISSION ERRED WHEN IT FOUND THAT HALL WAS PERMANENTLY AND TOTALLY DISABLED DUE TO HER KNEE INJURIES.
¶ 38. In finding Hall permanently and totally disabled, administrative judge stated:
based upon the assignations of various physicians of permanent partial impairment ratings of 37% to the left extremity and 20% to the right extremity combine to provide a basis for a functional loss of use for industrial purposes relative to [Hall] ... which will together term by operation of law a permanent and total disability status on behalf of [Hall],
The Commission affirmed the administrative judge’s finding and adopted it as its own.
¶ 39. Union Camp submits that the Commission erred when it found that Hall was permanently and totally disabled due to her knee injuries. According to Union Camp, Hall is not entitled to benefits for permanent total disability because (a) Hall put forth no proof of loss of wage earning capacity, (b) Hall did not conduct a job search, (c) no evidence supported a finding that Hall sustained total loss of use of her right knee, and (d) Hall could have returned to work at Union Camp. Based on our standard of review, the broad issue is whether the Commission’s conclusion that Hall’s two knee injuries resulted in permanent total disability was (a) an error of law, (b) an unsupported finding of fact, or (c) arbitrary or capricious.
¶ 40. Given our resolution of Issue II above, Hall presented a claim for a bilateral injury. Section 71-3-17(a) of the Mississippi Code governs permanent total disability in the context of worker’s compensation cases. “Loss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two (2) thereof shall constitute permanent total disability.” Miss.Code Ann. § 71-3-17(a) (Rev.2000). Of course, there is no evidence that Hall “lost” her legs due to her injury. Even so, “[cjompensation for permanent total *372 loss of use of a member shall be the same as for loss of the member.” Miss.Code Ann. § 71-3-17(c)(22) (Rev.2000). Applying the language of the two subsections, loss of use of two legs constitutes permanent total disability. The obvious question is, just what constitutes “loss of use of a member?”
¶41. For purposes of workers’ compensation law, there are two classes of disability: (a) functional disability, otherwise called “medical” disability, and (b) industrial disability, otherwise called “occupational” disability. Functional/medieal disability refers to physical impairment. Weatherspoon v. Croft Metals, Inc., 853 So.2d 776(¶ 11) (Miss.2003). Industrial/occupational disability refers to the manner in which a claimant functional/medical disability affects the claimant’s ability to perform the duties of his employment. Id.
¶ 42. In the event that a claimant’s functional/medical disability rating varies from a claimant’s industrial/oc-eupational disability rating, the claimant is entitled to the higher of the two ratings. Id. at (¶ 8). “For example, if [a claimant] had suffered an arm injury which translated to a 25% occupational/industrial disability, but a 40% functional disability, she would be entitled to benefits based on the 40% functional disability.” Id. In a scheduled member case, if a claimant presents evidence that he is unable to continue in the position that he held at the time he suffered an injury, that evidence creates a rebuttable presumption that the claimant suffered a total occupational loss of the scheduled member. Walker v. Delta Steel Bldgs., 878 So.2d 113(¶ 9) (Miss.Ct.App. 2003). The degree and permanence of a claimant’s industrial disability is a question of fact to be proven by the evidence and facts as a whole. Sherwin Williams v. Brown, 877 So.2d 556(¶7) (Miss.Ct.App.2004) (citing Miss.Code Ann. § 71-3-17(a) (Rev.2000)).
¶ 43. Incident to her employment at Union Camp, Hall had arthroscopic surgery on her left knee and partial knee replacement surgery on her right knee. When Hall started working at Union Camp, she worked as a “specialty assistant machine operator.” Hall described her duties as follows:
I was working basically on the slitter. You have dyes that you put on the slitter when you set it up to do the cuts and the scores. I would set those up. We had to go get the materials and put it on the conveyor for the machine to use. And then as an assistant, once the machine was set up, I worked behind the machine catching the cardboard as it came off, stacking it.
During May of 1992, Union Camp promoted Hall from a specialty assistant machine operator to a specialty machine operator. Hall still worked on the slitter. Rather than catch the cardboard as it came out of the slitter, Hall’s position as specialty machine operator required that she feed the cardboard into the slitter. Hall injured her left knee during the fall of 1992.
¶ 44. As of April 1, 1993, Dr. Bibighaus released Hall to return to Union Camp in a light duty capacity. Hall went back to her position as a specialty machine operator on the slitter. Hall worked two shifts, felt pain in her left knee, and was forced to stop working. During her April 29, 1993 appointment with Dr. Bibighaus, Hall told Dr. Bibighaus that she wanted to return to work. Dr. Bibighaus saw “no reason why [Hall] [could] not” return to work. Hall next saw Dr. Bibighaus during September of 1993. Hall told Dr. Bibighaus that she was doing well at work until she had a “very difficult hard week in which she said she was basically overworked.”
*373 ¶ 45. Dr. Bibighaus’s notes from Hall’s December 27, 1993 appointment indicate that Dr. Bibighaus suggested “that [Hall] talk to her employers ... about some job modification.” According to Dr. Bibi-ghaus’s notes, Hall asked Union Camp to modify her employment responsibilities. Dr. Bibighaus also notes that, according to Hall, Union Camp had been “unwilling to work with her.” Dr. Bibighaus’s notes indicate that Union Camp put Hall “back on another type job which requires a lot of heavy lifting and pushing.” Dr. Bibi-ghaus’s notes also show that Hall planned to return to work that day and that Dr. Bibighaus recommended that Hall refrain from working on the slitter.
¶ 46. Dr. Bibighaus’s notes incident to an appointment in March of 1994 reflect his opinion that Hall should not perform any work that involved twisting or stacking heavy cardboard. Again, Dr. Bibi-ghaus noted that he told Union Camp that Hall did not need to work the slitter.
¶47. In November of 1994, Hall left her position as a specialty machine operator on the slitter. Hall moved to the finishing department, where she operated a bundler. Two months later, Hall stopped operating the bundler and began operating a bandsaw in the finishing department. Hall primarily worked the bandsaw in the finishing department for the remainder of her time at Union Camp. However, Hall also worked on a dye press and on the gluers, according to Union Camp’s needs. According to Dr. Bibighaus’s notes incident to his appointment with Hall during September of 1995, Dr. Bibighaus informed Union Camp that Hall needed to work on light duty only.
¶ 48. Dr. Scott Jones and Dr. Gore both placed the following permanent restrictions on Hall: “No stooping, no pushing, no climbing, no lifting over twenty-five pounds if legs are used to lift.” Dr. Gore was of the opinion that Hall could not do any work that required prolonged standing, twisting, bending, or anything that required lifting.
¶ 49. Hall testified that she could not return to work at Union Camp because “her knees would not hold up to it” due to the twisting and stooping that accompanied the jobs. When asked whether Hall could return to work at Union Camp, Dr. Vise answered:
I [don’t] believe she could go back to work doing that type of work. By that, I mean, it could be any company, but in terms of standing and doing an assembly line work with two bad knees, even though one of them has had a partial repair. The other one has had a repair also. So to stand and to twist on her knees, to me would not be reasonable. At age 50, I think she ought to find some other kind of work that allows her to primarily take the load off her knees by not standing and being able to sit or do light work or sedentary work. In my mind, it’s no worse whether you’re twisting or whether you’re loading it standing if the knee is sick and she’s had two menisci out. I mean both are important. Twisting just happens to be a frequent common way that people injure their knees.... Standing 8 hours a day on a knee that is known to be sick and by that I mean having been injured or diseased — it doesn’t matter how it started — but if the knee is sick and bad and then it’s had two menisci, the shock absorbers, I would never recommend a patient to stand all day.
¶ 50. In a letter dated May 30, 1997, from Patricia Archer, personnel supervisor for Union Camp, to Liberty Mutual, Archer represented that Hall’s position in the finishing/specialty department may require her to work at any of seventeen machines. Further, Archer indicated that the physi *374 cal requirements of employment in the finishing/specialty department involved “stooping, limited climbing ... pushing of units up to 300 lbs. onto gravity-fed roller conveyors.” Archer also noted that employment in the finishing/specialty department averaged eight to ten hour workdays in which an employee would be required to stand 70% of the time. Clearly, those job requirements are contrary to Hall’s permanent restrictions.
¶ 51. Union Camp points out that Dr. Scott Jones reviewed a tape of Hall’s tentative job description. In a letter to Union Camp’s attorney dated November 20, 1997, Dr. Scott Jones opined that the activities detailed on the tape would be within Hall’s permanent restrictions. The job description to which Dr. Scott Jones referred is attached as an exhibit to Dr. Jones’s deposition.
¶ 52. In that job description, Archer listed Hall’s tentative duties as follows: “Although job title is specialty operator, work may be required at any of 17 various work stations in the finishing/specialty department. Various jobs at times require bending, lifting, reaching, pushing and pulling. Pushing is normally moving product on gravity rollers.” Archer also noted that a critical part of that employment involved standing 69% of the required eight hour work day.[3]
¶ 53. Just because Hall could perform the activities on the tape does not mean that the tape was an accurate representation of Hall’s job responsibilities. Hall called Arthur Burkman as a witness. Burkman worked at Union Camp and also served as a union representative. Burk-man testified that, while the tape depicted an accurate representation of the jobs on the tape, the tape did not accurately depict the responsibilities of someone who worked as a specialty operator.
¶ 54. Still, Union Camp called Charles Wright, Union Camp’s environmental safety and health coordinator. Wright testified that he reviewed a tape of Hall’s tentative employment responsibilities at Union Camp and that the tape depicted an accurate representation of the essential job functions and physical activities that Hall would be asked to perform in the finishing department. Accordingly, there was a conflict in the evidence. Again, we find that the trier of fact resolved that conflict.
¶ 55. Though it does not factor in our analysis, we recognize that Hall was found to be disabled within the context of Social Security benefits. Dr. Vise was of the opinion that Hall needed to work in a sedentary capacity and that Hall did not need to stand and work on an assembly line. Dr. Jones and Dr. Gore placed Hall on restrictions including a 25 pound lift capacity. While Hall could have performed the jobs on the tape, which are a part of the record, Archer’s job descriptions clearly included responsibilities that fell outside Hall’s restrictions. Accordingly, we find that the Commission did not err when it found that Hall was not able to return to her employment.
¶ 56. Consequently, Hall presented evidence that causes operation of the presumption of total occupational loss of use of her knees. However, an employer may rebut that presumption. Union Camp relies on the following language from Jensen:
Therefore, where a permanent partial disability renders a worker unable to *375 continue in the position held at the time of injury, we hold that such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant’s ability to earn the same wages which the claimant was receiving at the time of injury. The presumption arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the substantial acts of his usual employment. Rebuttal is shown by all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances. We find support for this holding in the same cases which created the substantial acts doctrine and which indicate that the ultimate determination must be made from the evidence as a whole considering loss of wage-earning capacity.
Jensen, 828 So.2d at (¶ 21).
¶ 57. Union Camp points out Hall’s testimony that she had previous experience working at a garment factory, as an EKG technician, and as the business manager of her husband’s body shop. According to Union Camp, Hall presented no proof that she could not return to work in those fields or any others to which she was suited by age, education, and experience.
¶ 58. True enough, Hall worked in a garment factory from 1966 to 1967, as an EKG technician for approximately four years, as a medical assistant for one year, and then sporadically in her husband’s body shop from 1976 to 1989.[4]
¶ 59. Hall was over fifty years old and her previous forms of employment were well in her past. Age has frequently been a factor in workers’ compensation cases. See Jensen, 828 So.2d at (¶ 18). Given our deferential standard of review and the intent of the Workers’ Compensation statutes, we cannot find that the Commission erred. Especially where Hall’s previous employment amounts to one year in a garment factory — employment that may well have fallen within the scope of Hall’s physical restrictions, an EKG technician for four years, and a medical assistant for one year. Hall had each of those jobs for a very brief period over twenty years prior to her employment with Union Camp. Additionally, Hall’s sporadic part-time duties at her husband’s body shop involved running errands, answering telephones, and performing light duty repair work. Certainly those tasks do not necessarily qualify Hall as a “business manager.”
¶ 60. Union Camp also claims that Hall was not entitled to benefits because she did not conduct a job search. On cross-examination, Hall testified that she did not seek any employment whatsoever after Dr. Vise ordered her not to return to work in October of 1997. However, Hall presented a bilateral injury claim. Hall’s evidence created a presumption of occupational loss of use of both her knees. A job search is not part of a claimant’s burden of proof because loss of use of two major scheduled members automatically gives rise to permanent total disability and 450 weeks of benefits. Miss.Code Ann. § 71-3-17(a), (c)(22).
¶ 61. Based on our highly deferential standard of review, we no error and affirm.
ISSUE ON CROSS-APPEAL
¶ 62. We now turn to the issues that involve Hall’s COPD claim. We begin *376 with Hall’s claim on cross-appeal that the Commission erred when it failed to find she was entitled to compensation for her COPD. If we find that the Commission was correct, Union Camp’s remaining issues become moot.
IV. WHETHER THE COMMISSION ERRED WHEN IT FOUND THAT HALL’S COPD CLAIM WAS NOT A COMPENSABLE INJURY.
¶ 63. Hall claims the Commission erred when it did not find that Hall’s COPD claim was a compensable injury. Naturally, Union Camp disagrees. We find no error as a result of the Commission’s decision.
¶ 64. Hall claims that the Commission should have found a causal connection between her COPD claim and her employment. Hall relies on Sharpe. In that case, the supreme court found that a workers’ compensation claimant was entitled to benefits where the claimant:
(1) suffered no pulmonary problems pri- or to his employment ...; (2) has demonstrated the presence of a lung ailment and/or shortness of breath; (3) has been exposed to substances at [his employment] which cause pulmonary distress; and (4) has been advised by every expert to avoid exposure to chemical irritants for fear of aggravation of his condition.
Sharpe, 767 So.2d at (¶ 18).
¶ 65. Unlike the claimant in Sharpe, Hall’s COPD was attributed to other causes. In 1976, Hall’s husband opened a body shop. Hall testified that she was not a full-time employee at her husband’s body shop, but she did work for a few hours a day until they closed the body shop in 1989. As for her duties in the body shop, Hall testified that she picked up parts, ran errands, did office work, helped dismantle cars, sanded finishes, removed interiors, and placed paper and tape on areas that were not to be painted. When Union Camp cross-examined Hall, Union Camp utilized medical records generated by Dr. Moore. Dr. Moore noted that Hall worked around body shop paint for a number of years. Hall admitted that she sanded ears and that the paint bay’s exhaust system vented near the office air conditioner. That is, paint fumes vented into the body shop office where Hall worked.
¶ 66. Hall also testified that there was a large volume of cardboard dust in the air from saws and “clean up day” in which the employees would clean under the machines. Hall testified that she “could smell a chemical” in the glue that held the boxes together. However, Hall admitted that she did not know whether she smelled any particular chemical in the glue or even what particular chemicals were in the glue.
¶ 67. Finally, Hall noted that Union Camp had an exhaust system and that Union Camp provided her with masks of which she “very seldom” used. Finally, Hall also testified that she smoked for eight to ten years. According to Hall, she smoked half a pack of cigarettes a day. On cross-examination, Hall admitted that she told a Dr. Chase that she smoked a pack and a half of cigarettes a day. Hall disputed that amount, but did not dispute that she told Dr. Chase that. According to Hall, “I just answered without thinking when I told him probably because I didn’t see that it was that significant.”
¶ 68. Hall also notes that Dr. Gore testified that Hall’s exposure to cardboard dust and chemicals at Union Camp caused or contributed to Hall’s COPD within a reasonable degree of medical probability. Actually, Dr. Gore testified that he thought “it could certainly lead to it.” On cross-examination, Dr. Gore admitted that he was not board-certified as a pulmonolo *377 gist and that he sent Hall to see Dr. Moore because Dr. Moore was a specialist and was more qualified to treat her for her breathing problems. To be specific, Dr. Gore felt that Dr. Moore was an “excellent” doctor.
¶ 69. On further cross-examination, Dr. Gore recognized that the primary cause of COPD is smoking. Dr. Gore was unaware that Hall had a history of smoking. Dr. Gore admitted that permanent damage could result where someone smoked a pack and a half of cigarettes for ten years. What is more, Dr. Gore also did not know about Hall’s employment history at the body shop. Dr. Gore testified that, within a reasonable degree of medical certainty, Hall’s smoking and her history at the body shop were potential causes of her COPD.
¶ 70. Dr. Gore testified that he was not aware of any specific levels of airborne irritants at Union Camp. Confronted with test results, Dr. Gore admitted that the test results were well beneath the recommended exposure limits. Dr. Gore was not aware whether the levels of acetone or acetate were within the OSHA guidelines.
¶ 71. “The function of the circuit court (and of this Court) on appeal from rulings of the Workers’ Compensation Commission is to determine whether there exists a quantum of credible evidence which supports the decision of the Commission.” Hale, 687 So.2d at 1224. We are not called upon to “determine where the preponderance of the evidence lies when the evidence is conflicting, given that it is presumed that the Commission, as trier of fact, has previously determined which evidence is credible and which is not.” Id. at 1224-25. Here, there is ample evidence that Hall’s COPD claim was not a compensable injury. As such, we affirm the Commission’s decision.
¶72. Union Camp raised issues as to whether Hall’s COPD claim was barred by the statute of limitations, whether Hall should have been allowed to amend her petition to controvert on the day of the hearing, and whether Hall should have been allowed to call Dr. Gore as an expert witness to her COPD claim when she had not designated him as an expert witness in that regard. Based on our decision that the Commission did not err in its decision that Hall’s COPD claim was not a compen-sable injury, these remaining issues become moot. Accordingly, we need not discuss them.
¶ 73. THE JUDGMENT OF THE CHICKASAW COUNTY CIRCUIT COURT IS AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE EQUALLY ASSESSED TO THE APPELLANTS/CROSS-APPELLEES AND APPELLEE/CROSS-APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.

. International Paper Corporation has since purchased Union Camp.

. Dr. Jones was of the opinion that Hall had improved as much as she was going to improve. At his September 1997 deposition, Dr. Jones still considered himself as Hall's treating physician.

. Although it has no bearing on our analysis, Hall made numerous attempts to return to work at Union Camp after her initial injuries. What is more, Union Camp had Hall’s supervisor rate her job performance. Hall’s supervisor rated Hall as "good” or "very good” in all areas.

. Hall worked as a homemaker from 1972 to 1976. We certainly do not imply that the duties of a homemaker do not entail substan-lial labor. We merely separate that labor from our analysis of Hall's wage-earning capabilities.