ISHEE, J.,
for the Court:
¶ 1. Bettye Logan was employed by the Klaussner Furniture Corporation d/b/a Bruce Furniture Industries (Klaussner). On October 9, 2003, Logan was injured when her foot became caught in some fabric fibers at work, and she fell. On the day of the accident, she saw Dr. Bruce Longest, who then referred her to Dr. Earnest B. Lowe Jr., an orthopedic surgeon.
¶ 2. On October 10, 2003, Logan visited Dr. Lowe. X-rays revealed that Logan had a fractured fibia and a spiral fracture of the tibia. Dr. Lowe treated Logan by *1140 putting a east on her left leg and foot. He noted that her injury would likely take at least three months to heal.
¶ 3. On November 14, 2003, Logan visited Dr. Kim Stimpson, another orthopedist. Dr. Stimpson recommended that Logan continue to wear the cast and return in a month. He also advised her to continue on non-weight-bearing status. On January 9, 2004, Dr. Stimpson recommended a fracture brace to replace the cast. Dr. Stimp-son found that Logan would be unable to return to work from January 20, 2004, through March 20, 2004.
¶ 4. Logan visited Dr. Stimpson again on March 26, 2004. Although the fracture was healing, Logan had some lower-extremity edema in her foot below the fracture base. Dr. Stimpson recommended the removal of the fracture brace, range-of-motion exercises for her knee and ankle, and progressive weight bearing on her right leg. He further opined that Logan was unable to return to work from March 26, 2004, through May 26, 2004.
¶ 5. In an April 23, 2004 visit, Dr. Stimp-son noted that Logan continued to have pain and swelling in her left leg. His report stated: “This appears to be some neuralgia and is most likely secondary to her fracture brace that was applied quite tightly as we noticed at her last visit.” At this time, Logan was ambulatory but still walked with a limp and had significant weakness. Dr. Stimpson returned Logan to limited-work duty, which he suggested should be sitting work only, from April 24, 2004, until May 30, 2004. He later extended the recommendation from May 25, 2004, until July 25, 2004. During this time, Logan was not permitted to work more than two hours at a time and could not lift or push more than ten pounds.
¶ 6. Per Dr. Stimpson’s evaluation, Logan returned to light-duty work for Klaussner in May 2004. In August 2004, the plant manager suggested she take a different position within the plant. However, a new position would have paid less than the $560 per week she was making prior to the injury. In addition, Logan only had experience in the cutting room. Therefore, she took a voluntary layoff. Logan began receiving Social Security disability benefits in May 2005. She applied for other positions in October 2005, but was unsuccessful in finding employment. She has not applied for any jobs since that time.
¶7. At Logan’s last appointment with Dr. Stimpson, she continued to have problems with her leg, which Dr. Stimpson noted was consistent with anterior tibial nerve injury. Dr. Stimpson found that Logan’s recovery was not within what would normally be expected. He recommended that Logan continue her work restrictions, but opined that Logan would be at maximum medical improvement (MMI) by October 2004.
118. Dr. Stimpson then referred Logan to Cornerstone Rehabilitation to undergo an MMI evaluation and a functional capacity evaluation (FCE). On September 22, 2004, David Brick, an occupational therapist, conducted the FCE. He found there was no physical or functional reason that Logan could not perform the light-duty work required by Klaussner.
¶ 9. Hill Rehabilitation Services also performed an FCE on Logan since Logan had attended Hill Rehabilitation Services for physical therapy. She was discharged from physical therapy on September 7, 2004. However, she returned to Hill Rehabilitation Services for an FCE on February 28, 2005. The therapist performing the evaluation found that Logan still had problems with her leg; therefore, she was only suited for sedentary positions where *1141 she was allowed to sit constantly and elevate her left leg.
¶ 10. Logan first saw Dr. Rommel Chil-dress, an orthopedic surgeon, on August 1, 2006. He ordered magnetic resonance imaging (MRI) tests on her hip and knee. On Logan’s August 21, 2007 visit, Dr. Chil-dress had reviewed the MRIs and found that Logan had a tear in the medial meniscus. He recommended that she use a cane or crutch and suggested some exercises for her knee. Dr. Childress advised Logan that she would need surgery to repair the tear but that this could be done on an elective basis.
¶ 11. Per her employer’s request, Logan visited Dr. Cooper Terry on February 9, 2009. At the time, Logan still had complaints regarding her knee. Dr. Terry opined that the knee pain and meniscal tear were related to Logan’s work injury. He also recommended a left knee arthros-copy. Logan had the surgery on July 18, 2009. As of September 23, 2009, Dr. Terry deemed Logan to have reached MMI. He assessed a 4% left-lower-extremity impairment and gave her no permanent work restrictions.
¶ 12. Logan filed a petition to controvert with the Mississippi Workers’ Compensation Commission on December 9, 2004. A hearing was held on August 12, 2010. Logan testified at the hearing. She stated that after the accident she had trouble completing daily activities because of her injury. At the time of the accident, Logan was living with her ailing mother, but the accident left her unable to care fully for her mother. Logan’s daughter, Ginnie Graham, had to help her with things such as grocery shopping and driving to doctor’s appointments. Logan stated that when she went to the grocery store, she had to hold on to the shopping cart the entire time and even sit down and rest on occasion. She also is unable to drive long distances. Logan further testified that she now lives with her daughter because “she helps me do several things I can’t do by myself.” With regard to employment, Logan stated she is unable to stand and cannot sit for extended periods without her leg and foot going numb.
¶ 13. Logan’s daughter, Graham, also testified. She stated that after Logan’s accident, she had to begin taking care of her mother and grandmother, as her mother could no longer complete daily activities or care for her ailing mother. According to Graham, Logan still has pain in her leg and cannot sit upright for more than two or three hours before her leg begins to swell.
¶ 14. Two vocational-rehabilitation experts testified as well. Logan’s expert, C. Lamar Crocker, stated that Logan has a 100% loss in the labor market. However, Klaussner’s expert, Jennifer Oubre, found that Logan has transferable skills and remains employable. Oubre asserted that Logan could perform customer service and receptionist-type positions. Although Ou-bre never met with Logan, she based her opinion on Logan’s medical records. However, Oubre admitted, after hearing the testimony of Logan and Logan’s daughter, that “if [their] testimony is true, then, yes, I would have to consider those [statements].” When asked, if the testimony were true whether that would change her mind, Oubre answered in the affirmative.
¶ 15. On July 29, 2011, the administrative judge (AJ) entered an order. The AJ found that Logan had not suffered “any industrial loss of use of her left lower extremity because of her work-connected injuries[.]” The AJ further stated: “Although [Logan] has a permanent medical impairment of 4% to her left lower extremity, a preponderance of the evidence does not support a finding that she sustained any industrial loss of use of her left lower *1142 extremity because of the work-connected impairment.”
¶ 16. Logan then filed a petition for review before the full Commission. On February 6, 2012, the full Commission affirmed the decision of the AJ. Logan now appeals, arguing (1) she sustained a 100% permanent and total occupational disability; (2) the full Commission’s affirmance of the AJ’s opinion was against the overwhelming weight of the evidence; (3) the AJ disregarded the opinion of her vocational expert, Crocker, and failed to consider her limited education and special training; (4) the AJ improperly accepted Oubre’s opinion, which was based solely on her review of medical records; and (5) the full Commission erred by failing to find that she was 100% occupationally disabled and unable to return to her previous work. Although Logan cites five issues on appeal, essentially the sole question is whether the AJ and full Commission’s ruling that she had not sustained a 100% permanent and total occupational disability was supported by substantial evidence. Included within this issue is whether the AJ and full Commission considered the relevant testimony and evidence.
DISCUSSION
¶ 17. On appeal, when considering workers’ compensation cases, we must determine whether the decision of the Commission was supported by substantial evidence. Pearson v. Lighthouse Point Casino, 49 So.3d 637, 638 (¶ 7) (Miss.Ct.App.2010) (citation omitted). “Because our review is limited, this Court ‘will only reverse the Commission’s rulings where findings of fact are unsupported by substantial evidence, matters of law are clearly erroneous, or the decision was arbitrary and capricious.’ ” Id.
¶ 18. Mississippi Code Annotated section 71-3-7(1) (Supp.2012) states: “Compensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease.” Disability is defined as an “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71-3-3(1) (Rev.2011). An occupational disability occurs when the claimant’s medical disability impairs his or her ability to perform the duties of his or her employment. See Union Camp Corp. v. Hall, 955 So.2d 363, 372 (¶ 41) (Miss.Ct.App.2006).
¶ 19. Logan argues that she did, in fact, sustain a 100% permanent and total occupational disability resulting from the work-related injury. She asserts that Dr. Stimpson placed the following restrictions on her, which were never removed: no prolonged standing or walking; no climbing, bending or stooping; no squatting or kneeling; no repeated climbing; weightlifting restrictions; and pushing, pulling, and lifting restrictions of ten pounds. Logan further claims that although she has reached MMI, she still has significant problems with her lower-left extremity.
¶ 20. We find the evidence in this case supports a finding of permanent partial or total disability. Therefore, the Commission erred by finding Logan suffered no permanent disability. First, the lay testimony by Logan and Graham establish that Logan continues to have significant problems with her leg. She is unable to complete various daily tasks and is unable to sit upright for more than a few hours. Both Logan and Graham testified that after sitting for two to three hours, Logan’s leg begins to swell and go numb. This clearly hinders her ability to continue *1143 working in even sedentary positions, which the doctors and vocational experts opined would be her only option for employment opportunities.
¶ 21. The vocational specialists’ testimony also supports Logan’s claim of permanent partial or total disability. Logan’s expert, Crocker, testified that Logan has a 100% loss in the labor market. Although the opposing expert, Oubre, testified that Logan could still find gainful employment, she admitted that if the testimony of Logan and Graham were true, she would change her opinion. This is significant because Oubre never spoke with Logan regarding her continuing medical problems when making her initial assessment. Furthermore, Logan was earning $14 per hour at her job at the time of the injury. The positions Oubre found that would be available to Logan earned approximately $7.25 to $8.50 per hour. In addition, the position Klaussner offered her after her injury would have paid less than the $14 she was earning pre-injury. Therefore, at the very least, Logan should have been assessed a loss of wage-earning capacity.
¶ 22. Finally, the medical evidence shows that Logan has a 4% permanent medical impairment. Although Dr. Terry did not assign any permanent work restriction, Logan’s other evaluators found that she had permanent work restrictions. Dr. Stimpson never removed her light-duty work restriction. The Cornerstone Rehabilitation FCE found that she was capable of performing light-duty work. The Hill Rehabilitation Services FCE found that Logan was only suited for sedentary positions in which she is able to sit constantly and elevate her leg. The lay testimony, vocational experts, and medical evidence establish that Logan has suffered a permanent partial or total disability. Accordingly, we reverse and remand this matter to the Commission for a determination of the appropriate award of compensation.
¶ 23. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPEL-LEES.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.