# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CT-01760-SCT

*BETTYE LOGAN*

*v.*

*KLAUSSNER FURNITURE CORPORATION d/b/a*
*BRUCE FURNITURE INDUSTRIES AND*
*AMERICAN CASUALTY COMPANY OF*
*READING, PA.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/23/2015 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANT: | ROY O. PARKER |
| | HALEY WADE McINGVALE, II |
| ATTORNEYS FOR APPELLEES: | AMY LEE TOPIK |
| | JOSEPH ANTHONY GERACHE, III |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION IS REINSTATED AND AFFIRMED - 03/15/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Bettye Logan sustained a compensable leg injury while employed at Klaussner Furniture Corporation d/b/a Bruce Furniture Industries ("Klaussner"). An Administrative Judge ("AJ"), and the Mississippi Workers' Compensation Commission ("Commission"), found that Logan had suffered a sixty-percent loss of industrial use to her left lower

extremity, which entitled her to 105 weeks of compensation set at $331.06 for her "scheduled-member" injury under Mississippi Code Section 71-3-17(c)(2). Logan appealed, and the Court of Appeals reversed, finding that the Commission and the AJ had applied the incorrect part of Section 71-3-17 and that either subsection (a) or subsection (c)(25) of the statute – and not subsection (c)(2) – applied. Klaussner and the American Casualty Company, the carrier, petitioned this Court for writ of certiorari. Having granted certiorari, the Court finds that the Commission and the AJ properly awarded Logan permanent-partial disability benefits under Section 71-3-17(c)(2). Accordingly, we reverse the judgment of the Court of Appeals and reinstate and affirm the holding of the AJ and Commission.

## FACTS AND PROCEDURAL HISTORY

¶2. This case is before the Court after a lengthy procedural history, having been heard twice by the Court of Appeals, the Commission, and an AJ. On October 9, 2003, Logan, then employed by Klaussner, tripped and fell at work, sustaining a leg injury. Logan filed a petition to controvert with the Commission on December 9, 2004.

### Logan I [1]

¶3. A hearing was held on August 12, 2010. Logan testified that she was working at Klaussner as a cutter and spreader when she tripped on strings of fabric and fell. Logan returned to light-duty work in May 2004. Initially, Logan was accommodated and placed in a position tearing tags from bundles and placing labels on products. Logan was able to remain seated in this position. After two weeks, a Klaussner plant manager suggested that

---

[1] *Logan v. Klaussner Furniture Corp.*, 127 So. 3d 1138, 1140 (Miss. Ct. App. 2013) (*Logan I*).

Logan take the bundling job. Logan did not believe that she could perform that job, and the bundling job paid less than her previous position. So Logan took a voluntary layoff. Logan began receiving Social Security disability benefits in May 2005.

¶4.    Logan stated that, after the accident, she had trouble completing daily activities because of her injury and testified that she began living with her daughter, Ginnie Graham ("Graham"). Graham also testified that, since Logan's accident, she had to take care of her mother, as she could no longer complete daily activities, such as grocery shopping or driving long distances. According to Graham, Logan could not sit upright for more than two or three hours before her leg began to swell.

¶5.    Extensive medical records and testimony were produced at the hearing, which were summarized by the Court of Appeals:

> On the day of the accident, [Logan] saw Dr. Bruce Longest, who then referred her to Dr. Earnest B. Lowe Jr., an orthopedic surgeon.
>
> On October 10, 2003, Logan visited Dr. Lowe. X-rays revealed that Logan had a fractured fibia and a spiral fracture of the tibia. Dr. Lowe treated Logan by putting a cast on her left leg and foot. He noted that her injury would likely take at least three months to heal.
>
> On November 14, 2003, Logan visited Dr. Kim Stimpson, another orthopedist. Dr. Stimpson recommended that Logan continue to wear the cast and return in a month. He also advised her to continue on non-weight-bearing status. On January 9, 2004, Dr. Stimpson recommended a fracture brace to replace the cast. Dr. Stimpson found that Logan would be unable to return to work from January 20, 2004, through March 20, 2004.
>
> Logan visited Dr. Stimpson again on March 26, 2004. Although the fracture was healing, Logan had some lower-extremity edema in her foot below the fracture base. Dr. Stimpson recommended the removal of the fracture brace, range-of-motion exercises for her knee and ankle, and progressive weight

3

bearing on her right leg. He further opined that Logan was unable to return to work from March 26, 2004, through May 26, 2004.

In an April 23, 2004 visit, Dr. Stimpson noted that Logan continued to have pain and swelling in her left leg. His report stated: "This appears to be some neuralgia and is most likely secondary to her fracture brace that was applied quite tightly as we noticed at her last visit." At this time, Logan was ambulatory but still walked with a limp and had significant weakness. Dr. Stimpson returned Logan to limited-work duty, which he suggested should be sitting work only, from April 24, 2004, until May 30, 2004. He later extended the recommendation from May 25, 2004, until July 25, 2004. During this time, Logan was not permitted to work more than two hours at a time and could not lift or push more than ten pounds.
. . .

At Logan's last appointment with Dr. Stimpson, she continued to have problems with her leg, which Dr. Stimpson noted was consistent with anterior tibial nerve injury. Dr. Stimpson found that Logan's recovery was not within what would normally be expected. He recommended that Logan continue her work restrictions, but opined that Logan would be at maximum medical improvement (MMI) by October 2004.

Dr. Stimpson then referred Logan to Cornerstone Rehabilitation to undergo an MMI evaluation and a functional capacity evaluation (FCE). On September 22, 2004, David Brick, an occupational therapist, conducted the FCE. He found there was no physical or functional reason that Logan could not perform the light-duty work required by Klaussner.

Hill Rehabilitation Services also performed an FCE on Logan since Logan had attended Hill Rehabilitation Services for physical therapy. She was discharged from physical therapy on September 7, 2004. However, she returned to Hill Rehabilitation Services for an FCE on February 28, 2005. The therapist performing the evaluation found that Logan still had problems with her leg; therefore, she was only suited for sedentary positions where she was allowed to sit constantly and elevate her left leg.

Logan first saw Dr. Rommel Childress, an orthopedic surgeon, on August 1, 2006. He ordered magnetic resonance imaging (MRI) tests on her hip and knee. On Logan's August 21, 2007 visit, Dr. Childress had reviewed the MRIs and found that Logan had a tear in the medial meniscus. He recommended that she use a cane or crutch and suggested some exercises for her knee. Dr.

4

Childress advised Logan that she would need surgery to repair the tear but that this could be done on an elective basis.

Per her employer's request, Logan visited Dr. Cooper Terry on February 9, 2009. At the time, Logan still had complaints regarding her knee. Dr. Terry opined that the knee pain and meniscal tear were related to Logan's work injury. He also recommended a left knee arthroscopy. Logan had the surgery on July 18, 2009. As of September 23, 2009, Dr. Terry deemed Logan to have reached MMI. He assessed a 4% left-lower-extremity impairment and gave her no permanent work restrictions.

*Logan I*, 127 So. 3d at 1139-1141.

¶6. Two vocational-rehabilitation experts testified at the hearing as well. Logan's expert, C. Lamar Crocker, opined that Logan had a one-hundred-percent loss in the labor market. Contrastingly, Klaussner's expert, Jennifer Oubre, opined that Logan had transferable skills and remained employable, and that she could work in customer service or as a receptionist. Oubre never met with Logan, but based her opinion on Logan's medical records.

¶7. On July 29, 2011, the AJ entered an order, finding Logan had not suffered "any industrial loss of use of her left lower extremity because of her work-connected injuries[.]" The AJ further stated: "Although [Logan] has a permanent medical impairment of 4% to her left lower extremity, a preponderance of the evidence does not support a finding that she sustained any industrial loss of use of her left lower extremity because of the work-connected impairment." Logan then filed a petition for review before the full Commission, and on February 6, 2012, the full Commission affirmed the AJ's order.

¶8. Logan appealed the decision of the AJ and Commission. The Court of Appeals characterized the sole issue on appeal as whether the AJ's and Commission's finding was supported by substantial evidence. The Court of Appeals held that "[t]he lay testimony,

5

vocational experts, and medical evidence establish that Logan has suffered a permanent partial or total disability[,]" and, "at the very least, Logan should have been assessed a loss of wage-earning capacity." *Id.* at 1143. The Court of Appeals reversed and remanded "for a determination of the appropriate award of compensation." *Id.*

## *Logan II*[2]

¶9.     On remand, the AJ issued an amended opinion in light of the Court of Appeals' decision and the evidence presented at the first hearing. The AJ found that Logan had suffered a sixty-percent loss of industrial use to her left lower extremity, entitling her to permanent-partial disability benefits in the amount of $331.06 for a period of 105 weeks. The AJ held that a finding of a permanent-total loss (one hundred percent) of industrial use to her left lower extremity would be contrary to the medical evidence. In support, the AJ relied on the testimony of two physicians – Dr. Stimpson and Dr. Terry – who opined that Logan could return to some form of work. On October 23, 2015, the Commission affirmed the decision of the AJ, finding that Logan had the ability to return to employment at least at a sedentary level based on the medical and vocational evidence. Logan again appealed.

¶10.     Logan argued that she was entitled to the maximum allowable amount of permanent-total disability compensation instead of the lower amount awarded by the AJ and the Commission. The Court of Appeals again reversed and remanded, this time on the basis of the Commission's alleged "erroneous application of law" with respect to Mississippi Code

---

[2] ***Logan v. Klaussner Furniture Corp.***, No. 2015-WC-01760-COA, 2016 WL 9454440 (Miss. Ct. App. Nov. 15, 2016), *cert. granted*, 229 So. 3d 711 (Miss. 2017) (***Logan II***).

6

Section 71-3-17.  The majority of the Court of Appeals held that either Section 71-3-17(a) or Section 71-3-17(c)(25), instead of Section 71-3-17(c)(2), applied because Logan's injury was "permanent" and resulted in a loss of wage-earning capacity.  Klaussner and American Casualty Company petitioned this Court for writ of certiorari, which we granted.

## STANDARD OF REVIEW

¶11.    It is well-settled law in this State that the Commission is the ultimate finder of fact in workers' compensation cases, and where substantial credible evidence supports the Commission's decision, then, absent an error of law, the decision must stand without judicial interference. *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1124 (Miss. 1992). In other words, the "Commission's findings of fact are entitled to substantial deference when challenged on appeal to the judiciary." *Raytheon Aerospace Support Servs. v. Miller*, 861 So. 2d 330, 335 (Miss. 2003) (citing *Vance v. Twin River Homes, Inc.*, 641 So. 2d 1176, 1180 (Miss. 1994)). Even if there is conflicting evidence, the reviewing court is not to determine where the preponderance lies because "it is presumed that the Commission as trier of fact has previously determined which evidence is credible and which evidence is not." *Miller*, 861 So. 2d at 335 (citation omitted). "The Commission's decision will be reversed only if it is not supported by substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law." *Lovett v. Delta Reg'l Med. Ctr.*, 157 So. 3d 88, 89 (Miss. 2015) (citation omitted). The findings of the Commission should be reversed "only in rather extraordinary cases." *Miller*, 861 So. 2d at 335 (quoting *Hale v. Ruleville Care Ctr.*, 687 So. 2d 1221, 1224-45 (Miss. 1997)).

7

**DISCUSSION**

¶12.    In *Logan I*, the Court of Appeals held that "evidence establish[ed] that Logan has suffered a permanent *partial or total* disability," and that court remanded the case "to the Commission for a determination of the appropriate award of compensation" in light of that holding. *Logan I*, 127 So. 3d at 1143 (emphasis added). Following that court's instructions on remand, the Commission found that Logan had established a sixty-percent industrial loss of use to her left leg, after finding she had failed to prove a total loss of wage-earning capacity and permanent total disability. Logan was awarded 105 weeks of compensation for her permanent-partial, scheduled-member injury.

¶13.    In *Logan II*, the Court of Appeals improperly held that either Section 71-3-17(a) or Section 71-3-17(c)(25) applied in this scheduled-member case, not Section 71-3-17(c)(2), which the Commission properly applied. Permanent-partial disability compensation is governed by Section 71-3-17(c), which reads:

> In case of disability *partial* in character but permanent in quality, the compensation shall be sixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with paragraph (b) of this section, and shall be paid to the employee. . . .

Miss. Code Ann. § 71-3-17(c) (Rev. 2011) (emphasis added).   A claimant may be compensated for a leg injury under the permanent-partial statute for a maximum of 175 weeks. *See* Miss. Code Ann. § 71-3-17(c)(2). Under this statute, subsections (c)(1) thru (c)(24) control in cases of permanent-partial disability involving the loss or loss of use of a scheduled member, such as a leg, and other specified injuries.

8

¶14. The Commission specifically found that Logan did not sustain a total loss of wage-earning capacity, and its finding was supported by substantial evidence. The Commission correctly awarded benefits under the schedule, Section 71-3-17(c)(2), because subsection (c)(25) does not apply to scheduled-member cases. Nor does subsection (a) apply, as the injury was not permanent total. Subsection (c)(2) controls this case, as this case involved a permanent-partial disability to Logan's leg.

**CONCLUSION**

¶15. The Commission's decision is consistent with the law governing benefits for a permanent-partial disability and is supported by substantial evidence. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Commission.

¶16. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., KITCHENS, P.J., KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. ISHEE, J., NOT PARTICIPATING.**