SMITH, Justice,
for the Court:
James Dial worked for Bolivar County Gravel Company or its predecessors from 1959 until September 12, 1987. There is no dispute that Dial has chronic lung disease which prevents him from continuing to work. The question is causation and the percentage which can be attributed to pre-existing conditions not related to his employment.
Initially, Dial alleged his lungs were damaged by exposure to welding smoke on November 24, 1986. He later amended his claim to allege that the damage occurred from repetitive exposure to smoke and diesel fumes throughout the ten years he was employed with this employer.
During the first eight and one-half years of the ten year period, United States Fidelity & Guaranty Company was the insurance carrier, and they were added as a party. Prior to the hearing before the administrative judge, USF & G settled with the Claimant. This left a claim for a period of approximately eighteen months.
The administrative judge found that Dial’s one-time exposure to welding fumes on November 24, 1986, caused only temporary disability from which he recovered. The judge found that the chronic lung disease was present prior to Dial’s exposure to welding fumes, but awarded him benefits for permanent total disability, finding that the disability could not be apportioned.
The order of the administrative judge was appealed to the Full Commission on July 19, 1990. The Workers’ Compensation Commission affirmed the award of benefits but reduced the award by 90 percent based on preexisting conditions. Both parties appealed the Commission’s order to the Circuit Court of Bolivar County, which affirmed the Commission.
The direct appeal challenges the finding that Dial’s exposure to welding fumes permanently worsened his pre-existing lung impairment and that the claim is not barred by the two-year statute of limitations. The issues are stated as follows by Bolivar County Gravel:
A. Does substantial evidence exist in the record to support the finding of the Missis *101 sippi Workers’ Compensation Commission that Claimant’s exposure to welding smoke for an eighteen-month period permanently exacerbated his pre-existing lung impairment?
B. Does substantial evidence exist in the record to support the finding of the Mississippi Workers’ Compensation Commission that the cumulative effect of Claimant’s exposure to welding smoke was not evident until September 12, 1987 (the date Claimant quit working), thus avoiding the bar of the two-year statute of limitations?
By cross-appeal, Dial raises the following issue:
A. Does substantial evidence exist in the record to support the decision of the Circuit Court to affirm the decision of the Mississippi Workers’ Compensation Commission to apportion the Appellee/Cross-Appellant’s benefits by ninety percent for a pre-existing disease?
This Court affirms the decision of the Commission and the lower court.
THE FACTS
James Dial worked for the gravel company from 1959 until September 12, 1987. Over the years the company was under several different names. The employer has been Bolivar County Gravel Company since 1977.
During his employment with the gravel company, Claimant held several jobs: a tow boat operator, a dredge operator, a gravel pumper, a welder and a mechanic. Claimant testified that some welding was “on top on the screening plants” and some “down in the holes in the barges” where there was no ventilation. When asked to estimate how often he welded, Claimant was unable to say other than “whenever something broke down.”
Claimant explained what happened on November 24, 1986, as follows:
Well, we went out to the dredge and worked on the dredge that morning. It was almost dinnertime, so we decided to go over and get the barge off, pull the barge off the ground. We got over there, and whenever I hooked onto it, I pulled the eavel off. So we set the cavel back up. James Bennett, he started welding first on ’em. So they quit to eat dinner. And I got the welder and started welding till they got through eating dinner. And I got to coughing and got strangled on that smoke, and I had to quit ...
For two or three days or a week there, I was coughing up black stuff and blow black stuff out your nose.
Claimant did not go to a doctor until December 20, 1986. After going to the emergency room that day, he went to his family physician, Dr. Lindsey, the following Monday. Dr. Lindsey put him on medication and sent him home. On Christmas Day of 1986, Claimant again went to the emergency room and was admitted to the hospital by Dr. Lindsey. He went back to work in February and worked until September.
Prior to this incident in 1986, Claimant was hospitalized for a lung problem in 1980 and a collapsed lung in May, 1983. Claimant was a cigarette smoker, smoking one and a half to two packs a day from 25 to 28 years. He stopped smoking in 1982. He claims that he “didn’t have no trouble breathing problems till 1986.” His current complaints included dizziness, cramps in his side, and exhaustion after slight exertion.
Rose Dial, wife of the Claimant, testified that her husband would cough and “get strangled” after breathing welding fumes. According to her, he would also cough up sputum sometimes for three or four days after inhaling smoke. She said that the first time he had problems was beginning in 1975 or 1980.
Howard Gilbert, foreman at Bolivar County Gravel who worked thfere for eighteen years, testified for the employer. He testified that the screens would have to be changed every three months and would take probably one hour of welding. This would be out in the open. Holes in pipes and holes in the bottom of the barge would also require welding. Gilbert estimated that the Claimant went inside a barge and welded in an enclosed space “at least a dozen times” during the time he was foreman. He also estimated that the welding machine was cranked up an average of twice a week and that *102 Claimant was one of several welders who used the machine. Gilbert said that Claimant “done half’ of the welding because one of the other men was a certified welder. Gilbert said his first knowledge that Claimant had a problem with inhaling welding fumes in November, 1986, was when Mrs. Dial came by his home and told him. He denied or did not remember that Claimant had told him about the incident a couple of days later.
The medical testimony was in the form of the depositions of four physicians: Dr. Barry L. Whites; Dr. Arthur W. Lindsey, Jr.; Dr. Richard L. Boswell; and Dr. Francis Fountain.
Dr. Whites is a licensed pulmonary specialist in Jackson. He first saw the Claimant on April 15, 1987. Claimant was referred to him by worker’s compensation for a second opinion concerning a possible contributing factor of allergic bronchitis and asthmatic bronchitis to fume inhalation.
Dr. Whites was of the opinion that the one incident in 1986 caused an exacerbation or worsening of the pre-existing obstructive lung disease but that it did not result in any impairment. Dr. Whites also testified that “I think we can say to a reasonable medical probability that his cigarette smoking did— did and has contributed to his obstructive lung disease at this point.” Dr. Whites did not believe that Claimant’s December, 1986, hospitalization was due to the inhalation of welding fumes. Based on data obtained from Dr. Lindsey and other historical data, Dr. Whites thought Claimant had pre-existing obstructive lung disease. His testimony was that the Claimant has an impairment rating or percentage of 10 to 30 percent from a pulmonary standpoint. The cause of the impairment was asthmatic bronchitis, a form of obstructive lung disease, which has no specific cause but several things can worsen it. Cigarette smoking usually has a causal relationship in the disease. Dr. Whites would not say that welding smoke was a contributing factor. He characterized the exposure to welding smoke as an acute event but over with: “It’s a dent in the car that’s been repaired.”
Dr. Lindsey is a general family practitioner in Cleveland. Of the four doctors he is the only one who is not a pulmonary specialist. He is also the doctor who has treated the Claimant over the longest period. Dr. Lindsey or a member of his clinic had seen Claimant as a patient at least since January, 1975. When Claimant was treated in January, 1975, his complaint was cough, nausea and dizziness. The diagnosis was acute bronchitis.
On December 28, 1979, Claimant came to Dr. Lindsey’s office with coughing and dizziness, stating that he had breathed welding rod smoke on December 15, 1979. Various medicines were prescribed and Dr. Lindsey was of the opinion that Claimant fully recovered with no lasting effect.
On February 25, 1983, Claimant was again seen complaining of cold, coughing and shortness of breath. In August, 1983, Claimant was hospitalized with a spontaneous pneumo-thorax or collapsed lung. Dr. Lindsey gave no specific cause of the collapsed lung.
Dr. Lindsey saw Claimant on December 22, 1986 when he came in complaining of coughing and shortness of breath since breathing welding smoke on November 11, 1986. Dr. Lindsey’s tentative diagnosis was asthmatic bronchitis.
Dr. Lindsey subsequently saw Claimant on December 25,1986, when he was admitted to the hospital. When Dr. Lindsey saw him in his office on January 5, 1987, Claimant had improved but was still on medication. Dr. Lindsey saw him several times during the remainder of January and advised him he could return to work on February 2, 1987.
Dr. Lindsey was of the opinion that Claimant was a hundred percent occupationally disabled as a result of his bronchitis. He was further of the opinion based on a reasonable degree of medical certainty that the welding fumes Claimant breathed on November 20, 1986, did cause the allergic or asthmatic bronchitis that led to his lung condition. Dr. Lindsey also stated that if Claimant was exposed to welding fumes his condition would become much worse. Dr. Lindsey testified that it was his opinion that Claimant did not have asthma or emphysema prior to November of 1986. His opinion was that the 1986 incident was the sole case of Claimant’s *103 present lung impairment. Dr. Lindsey said, “I suppose that you could say a very small percent of his impairment might be due to something else ... Cigarette smoking, repeated respiratory infection.”
The third doctor whose deposition was entered was Dr. Richard Boswell. Dr. Boswell is board certified as a specialist in pulmonary medicine and licensed in Tennessee.
Dr. Boswell’s opinion was that the Claimant sustained permanent partial disability as a result of the aggravation of his pulmonary problems due to exposure to welding and diesel fumes. When asked to quantify the disability on a percentage basis, Dr. Boswell said, “We know, I think, from evaluation of large numbers of people that this kind of exposure in them is probably going to be ten percent plus or minus five to eight percent from there, part of their problem with cigarette smoke being in the vast majority nearly all the rest of it.” Dr. Boswell related this disability to the lungs alone. When asked if the maximum contribution to Claimant’s total lung impairment from welding smoke would be about ten percent, Dr. Boswell said, “Ye s.”
Dr. Boswell testified that if the welding had been done in open space for short periods over the thirty year period it would be unlikely to cause significant permanent damage. Dr. Boswell did not see the 1986 incident as a significant factor in Claimant’s permanent lung impairment.
Dr. Francis Fountain is a board certified specialist in special medicine and also certified in pulmonary medicine. He is licensed in Mississippi and Tennessee.
Dr. Fountain felt that Claimant’s lung damage was “due to a combination of factors, including smoking, inhalation of noxious agents of many types, possible repeated episodes of bronchitis of an acute and infectious variety.” He felt that welding fumes had aggravated the Claimant’s condition based on a reasonable degree of medical certainty or probability. However, Dr. Fountain was unable to put a percentage on what part of the Claimant’s respiratory problem was caused by welding fumes. He said, “I don’t think we can precisely say ‘X’ percent is due to this and ‘Y’ percent due to that.”
DISCUSSION
IS THERE SUBSTANTIAL EVIDENCE TO SUPPORT THE COMMISSION’S FINDINGS?
This Court’s scope of review in worker’s compensation appeals is limited to a determination of whether substantial evidence exists to support the findings of the Worker’s Compensation Commission. Hardin’s Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1264 (Miss.1990). Bolivar County Gravel contends that the medical testimony is too insubstantial and tenuous to support the findings of the Commission.
Claimant contends that the “last injurious exposure” rule should apply. In Singer Co. v. Smith, 362 So.2d 590, 598 (Miss.1978) this Court stated:
The “last injurious exposure” rule as set forth by Larson, Workmen’s Compensation Law 95 (1978) is:
When a disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation.
It is not necessary at this time to rule on the application of the rule in this state, since the facts do not present such a situation. The purpose or justification for such a rule is to set a definite and certain time for liability to attach and thus avoid the often difficult task of determining, which of a series of injuries caused the disability or which of a series of exposures caused the disabling disease. In the absence of difficulty in locating a definite and certain time, the rule has no application.
This Court also discussed the “last injurious exposure” rule in Mid-South Insulation Co. v. Buckley, 396 So.2d 7 (Miss.1981), but also found it inapplicable there.
This Court has frequently stated that in doubtful cases the doubt should be resolved in favor of compensation so that the beneficent purposes of the Worker’s Compensation *104 Act may be carried out. Mitchell Buick v. Cash, 592 So.2d 978, 981 (Miss.1991); Barham v. Klumb Forest Products Center, Inc., 453 So.2d 1300 (Miss.1984); Youngblood v. Ralph M. Parsons Co., 260 So.2d 188 (Miss.1972); M.T. Reed Construction Co. v. Garrett, 249 Miss. 892, 164 So.2d 476 (1964).
In the case sub judice, the Claimant offered testimony of repeated exposure to welding fumes over the entire period of his employment, which included the eighteen month period in question. In particular, the November, 1986 episode is pointed to as a pivotal event in the progression of Claimant’s lung problems. While the medical testimony differed on the significance and attribution of specific percentages to the work related exposure, there was sufficient evidence to support a finding that compensable injury occurred during the period in question. Due to the nature of the injury and the difficulty of locating a definite and certain point of injury, Bolivar County Gravel Company and Hartford cannot be excused from liability. There is sufficient evidence to support the findings. The finding of compensable injury is affirmed.
IS THE CLAIM BARRED BY THE TWO YEAR STATUTE OF LIMITATIONS?
Miss.Code Ann. § 71-3-35(1) provides as follows:
No claim for compensation shall be maintained unless, within thirty (30) days after the occurrence of the injury, actual notice was received by the employer or by an officer, manager, or designated representative of any employer. If no representative has been designated by posters placed in one of more conspicuous places, then notice received by any superior shall be sufficient. Absence of notice shall not bar recovery if it is found that the employer had knowledge of the injury and was not prejudiced by the employee’s failure to give notice. Regardless of whether notice was received, if no payment of compensation (other than medical treatment or burial expense) is made and no application for benefits filed with the commission within two years from the date of the injury or death, the right to compensation therefor shall be barred.
Appellant contends that when Claimant filed his Amended Petition to Controvert on October 10, 1988, more than two years had passed since he had periods of temporary total disability from breathing welding smoke and his claim should be time barred under the statute. This argument was rejected below on the grounds that the cumulative effect of Claimant’s exposure to welding smoke was not evident until September 12, 1987, or the day he quit working.
Appellant cites several portions of the Claimant’s testimony to argue that in 1980 he had a period of disability due to exposure to welding smoke. Claimant testified that Dr. Lindsey told him in 1980 his “bronchial tubes was stopped up breathing welding smoke.” However, in his deposition, Dr. Lindsey stated that the Claimant recovered from this episode, which Dr. Lindsey noted as occurring in December 1979, and his breathing “seemed as good after he had recovered from that as it was before.” Although regularly exposed to welding smoke, it was not until 1986 that Claimant again sought medical treatment from Dr. Lindsey for breathing welding fumes. After each exposure there was a recovery which allowed the Claimant to return to work.
The Claimant’s occupational disability did not fully manifest itself until September 12, 1987, when he could no longer perform his duties at Bolivar County Gravel Company. Although the employer correctly notes that the Claimant was affected and treated for exposure to welding smoke long before 1987 there was no occupational disability which would have caused him to file for compensation.
Claimant cites Jenkins v. Ogletree Farm Supply, 291 So.2d 560, 562 (Miss.1974), as support for his position. In that case a farm worker suffered from asthma which was aggravated and accelerated because of spreading lime and fertilizer as a part of his job. The time bar was rejected based on evidence that the claimant’s condition gradually worsened and he filed within two years after terminating his employment. As in the present case the disability was gradual and the result of cumulative exposure rather than *105 from a single event. That case was different in that there was no appeal from the ruling, and this Court was bound by the order of the Commission.
This assignment of error is without merit.
CROSS-APPEAL
WAS THE COMMISSION CORRECT IN APPORTIONING BENEFITS?
Apportionment of compensation is governed by Miss.Code Ann. § 71-3-7, which states in pertinent part:
Where a preexisting physical handicap, disease, or lesion is shown by medical findings to be a material contributing factor in the results following injury, the compensation which, but for this paragraph, would be payable shall be reduced by that proportion which such preexisting physical handicap, disease, or lesion contributed to the production of the results following the injury.
In this case the Commission reversed the decision of the administrative judge not to apportion the award of benefits and reduced the award by ninety percent. Claimant argues that this was error based on Delta CMI v. Speck, 586 So.2d 768 (Miss.1991).
In that case, relying on its holding in Stuart’s Inc. v. Brown, 543 So.2d 649 (Miss.1989), the Court held that only pre-existing medical conditions which resulted in occupational disability would require apportionment. Speck was both gainfully and continuously employed until his exposure and injury in 1982 when he became unable to work. Speck was a spray painter with paint containing zinc; he also smoked cigarettes for approximately twenty years. The testimony was that his pulmonary damage was occupationally related with some contribution from smoking. The medical testimony was that it would be difficult to attach a specific number to the contribution from each component. The administrative judge ordered the employer to pay Speck permanent and total disability benefits. The Commission apportioned the benefits by fifty percent. The circuit court reversed the apportionment and this Court affirmed.
The Speck case, while having some similarities to the present case, can be factually distinguished in that the worker there experienced disability several days after breathing the zinc dust. Here there was a gradual deterioration and medical testimony that Dial’s pre-existing problems were the substantial part of the resulting occupational disability.
In Stuart’s, 543 So.2d at 654, the Court stated that “only pre-existing occupational disabilities generate a duty to apportion.” The Court specifically stated that this language was not addressed to either occupational diseases or heart attack cases. Id. at 655. The Court quoted favorably from 2 Larson, The Law of Workers Compensation (1987) as follows:
Apart from special statute, apportionable “disability” does not include a prior non-disabling defect or disease that contributes to the end result. Nothing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in states having special statutes on aggravation of disease, no attempt is made to weigh the relative contribution of the accident and the preexisting condition to the final disability or death. Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense.
* * * ⅜ ⅜ *
Of course, the matter is entirely different if the degenerative condition is itself the cause of the disability for which compensation is claimed, quite apart from the effect of the industrial accident. Thus, it may be found on the facts of a particular case that after the period of the temporary disability caused by the accident was completed, any subsequent long range disability stemmed entirely from a preexisting infirmity.
The essential distinction at stake here is between disability that independently produces all or part of the final disability, and a preexisting condition that in some way *106 combines with or is acted upon by the industrial injury.
Larson, §§ 59.21-59.22(b) (footnotes omitted) (emphasis added).
In the present case, according to the medical testimony, Dial had a history of lung problems going back to 1975. Only Dr. Lindsey testified that the exposure to welding fumes in November, 1986, was a factor in the subsequent disability. Dr. Whites testified emphatically that there was not a continuing injury. The occupationally disabling condition was the pre-existing lung condition and not the occupational exposure. The occupational exposure was not the cause or precipitant in the onset of the disease. There was medical testimony that the preexisting condition became fully occupationally disabling as the result of the natural progression of the disease. The pre-existing condition was a “material contributing factor in the results following injury” making apportionment mandatory.
Based on the medical testimony that Claimant’s disability was substantially caused by pre-existing illness, the lower court was correct in apportioning the award and reducing the compensation by ninety percent. This Court affirms the Commission and lower court on this issue.
CONCLUSION
The findings of the Commission are supported by substantial evidence. Claimant filed within two years of becoming disabled and consequently his claim is timely.
The question of apportionment is resolved in favor of supporting the Commission in finding that the Claimant’s disability was primarily the result of a pre-existing condition rather than work-related and should be reduced by ninety percent. The decision of the lower court is affirmed.
AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL.
HAWKINS, C.J., and DAN M. LEE and PRATHER, P.JJ., and JAMES L. ROBERTS, Jr., J., concur.
BANKS, J., dissents in part with separate written opinion joined by SULLIVAN and PITTMAN, JJ., and joined in part by McRAE, J.
McRAE, J., dissents with separate written opinion joined by SULLIVAN, J., and joined in part by BANKS, J.