# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-WC-00040-COA

| | |
|---|---|
| **TERESA L. EICHHORN** | **APPELLANT/ CROSS-APPELLEE** |
| v. | |
| **THE KROGER COMPANY AND KROGER LIMITED PARTNERSHIP I** | **APPELLEES/ CROSS-APPELLANTS** |

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2019 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANT: | FLOYD E. DOOLITTLE<br>ROGER K. DOOLITTLE |
| ATTORNEYS FOR APPELLEES: | CLIFFORD B. AMMONS<br>CLIFFORD BARNES AMMONS JR. |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.<br>ON CROSS-APPEAL: AFFIRMED -<br>04/13/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     On April 14, 2017, Teresa Eichhorn, a sixty-three-year-old cashier with The Kroger Company,[1] suffered a work-related repetitive-motion injury to her left shoulder. Seven months later, she reached maximum medical improvement (MMI) with a three-percent impairment to her left upper extremity and was given the following restrictions: not to carry

---

[1] The Kroger Company and Kroger Limited Partnership I are collectively referred to as Kroger.

or lift anything over twenty pounds and not to lift anything above her head. Eichhorn returned to work as a "U-scan" cashier, a light-duty position.

¶2. Eichhorn filed a petition to controvert with the Mississippi Workers' Compensation Commission (Commission) on March 13, 2018. Kroger admitted that Eichhorn had sustained an injury during the course of employment but disputed the amount of the average weekly wage stated in her petition. Kroger also denied that Eichhorn was "permanently disabled to the extent and for the period stated in the [p]etition to [c]ontrovert" and asserted an affirmative defense of apportionment, claiming that Eichhorn "suffer[ed] from [a] pre-existing disease." Kroger further noted Eichhorn had received compensation in the amount of $2,361.15.

¶3. A hearing was held before the Commission's administrative judge (AJ) on March 8, 2019, to address two issues: (1) "the extent of [Eichhorn's] permanent disability and resulting loss of wage-earning capacity and/or industrial loss of use suffered"; and (2) whether apportionment would apply to any award.

¶4. Eichhorn's treating physician, Dr. William Geissler, testified by deposition that Eichhorn had injured her left shoulder while scanning groceries but had no history of injury to any other part of her anatomy. He noted that her MRI indicated "partial tears of the supraspinatus tendon versus tendonitis" and that she had undergone physical therapy prior to seeing him. When Dr. Geissler saw Eichhorn in August 2017, she expressed to him that "she didn't feel she could go back to scanning groceries at that point." Dr. Geissler agreed with the Functional Capacity Evaluation (FCE) therapist that Eichhorn may be able to

2

perform medium-level tasks for shorter periods. He further agreed with the restrictions in the FCE with regard to Eichhorn's left shoulder. Although Dr. Geissler acknowledged that Eichhorn had reported "[p]ain in neck and right shoulder with lifting" and "in low[er] back with bent forward positions" in the FCE, she had only listed a problem with her left shoulder in the patient intake form.

¶5.    Mabel Jones, a former human-resources employee for Kroger, testified that she had assisted in facilitating Eichhorn's return to work. Jones met with Eichhorn regarding the physician's restrictions and felt that she could not return to her regular duties as a cashier. Greg Hayes, the co-manager for the Kroger where Eichhorn is employed, acknowledged that the written job description for a cashier position at Kroger requires lifting up to fifty pounds but explained that cashiers typically do not lift over twenty pounds due to scanning technology. Hayes also confirmed that Eichhorn's current position as a "U-scan" cashier is a permanent, full-time position at Kroger.

¶6.    Eichhorn testified that when working as a cashier, she had to lift items over twenty pounds. She had also worked as a clerk/stocker, which required her to lift items above her head. Eichhorn testified that her current position as a "U-scan" cashier was within her restrictions and that she was happy with that job. She also acknowledged that under her union contract, she had received a pay increase and now earns more than at the time of her injury.

¶7.    Kathy Smith, a certified rehabilitation counselor, interviewed Eichhorn on October 8, 2018. At the hearing, Smith opined that Eichhorn had a "30 to 50 percent loss" of access

3

to jobs. Pete Mills, a vocational rehabilitation specialist testifying on behalf of Kroger, stated that he had examined Eichhorn's work history and reviewed her medical reports and the FCE. Mills said that he believed someone could return to cashier work at Kroger if no lifting over twenty pounds was required, noting Hayes's testimony at the hearing and his description of the cashier duties. However, Mills acknowledged that he had stated in his report that based on the written job description and her restrictions, Eichhorn could not return to her pre-injury job at Kroger. He also admitted he had been unable to locate any other jobs in the current labor market where Eichhorn could earn a salary commensurate to her current wages.

¶8.     The AJ issued his order on May 2, 2019, finding Eichhorn had "suffered a 15% of industrial loss of use of a scheduled member, her left upper extremity." The AJ concluded that Eichhorn was entitled to permanent partial disability benefits of $357.75 per week, for thirty weeks beginning November 9, 2017,[2] with credit to be given to Kroger "for any and all monies, wages[,] and previously paid to claimant." The AJ further held that apportionment was not applicable, as "there was no showing of previous permanent impairment to claimant's left shoulder[,] and the benefits awarded are not based on any other previous impairments she may have had to other parts of her body[.]"

¶9.     Aggrieved at the percentage of permanent disability awarded, Eichhorn filed a request for review with the Commission. She also filed a motion for the recusal of the Commission's chairman on July 20, 2019, which the Commission denied. On December 20, 2019, the Commission affirmed and adopted by reference the AJ's decision.

_____

[2] The date of MMI was November 8, 2017.

¶10. Eichhorn alleges that the Commission erred in denying her motion to recuse the chairman, and she challenges the AJ's determination of "usual employment" and percentage of permanent partial disability. Kroger has also filed a cross-appeal of the AJ's finding of a fifteen-percent permanent partial disability, arguing that the AJ "totally disregarded" the FCE and Dr. Geissler's testimony in reaching "a 15% industrial loss of use to the left arm" and that Eichhorn's disability "should have been no more than the 3% medical impairment rating." Finding there was substantial credible evidence to support the Commission's decision, we affirm.

## STANDARD OF REVIEW

¶11. "It is well-settled law in this State that the Commission is the ultimate finder of fact in workers' compensation cases, and where substantial credible evidence supports the Commission's decision, then, absent an error of law, the decision must stand without judicial interference." *Hayes v. Howard Indus. Inc.*, 284 So. 3d 787, 793 (¶19) (Miss. Ct. App. 2019) (quoting *Logan v. Klaussner Furniture Corp.*, 238 So. 3d 1134, 1138 (¶11) (Miss. 2018)). Thus, we will only reverse the Commission's decision "if it is not supported by substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law." *Id*. (quoting *Logan*, 238 So. 3d at 1138 (¶11)). Issues of law are reviewed de novo. *Id*. (citing *Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 882 (¶21) (Miss. Ct. App. 2016)).

## DISCUSSION

I. **Whether the Commission erred in denying the motion to recuse the Commission's chairman.**

5

¶12. Eichhorn filed a motion for the chairman of the Commission to recuse himself, alleging that he was "hostile" to the interests of claimants and had "engag[ed] in extensive legislative and political activity . . . inconsistent with the independence and impartiality of a 'trier of fact.'" For these reasons, she claimed that the chairman had violated Mississippi's Code of Judicial Conduct.

¶13. Adopting the standard for recusal employed by the Mississippi Supreme Court in *Byrd v. Greene County School District*, 633 So. 2d 1018 (Miss. 1994), the Commission denied the motion to recuse, finding the record "void of allegations of the [c]hairman's financial interest in this matter[,] as well as lack of proof of personal animosity toward the [c]laimant." *Byrd* involved a teacher who was terminated because of budget constraints and later requested that the school board's hearing officer recuse himself because the officer was employed by a law firm that had represented the school district in other matters. *Id*. at 1021. The hearing officer denied the request, and the school board voted not to renew the teacher's contract for the following year. *Id*.

¶14. The chancery court in *Byrd* determined on appeal, however, "that a reasonable person would have doubted the impartiality of the hearing officer and ruled that [the hearing officer] should have recused himself." *Id*. The school district cross-appealed the chancery court's ruling, "argu[ing] that the [court] applied the wrong standard for determining whether recusal was proper." *Id*. at 1022. The supreme court agreed, reasoning:

> This Court has established that there is "a presumption of honesty and integrity in those serving as adjudicators." *Spradlin v. Board of Trustees of Pascagoula Municipal Separate School District*, 515 So. 2d 893, 898 (Miss. 1987); *Dampier v. Lawrence County School District*, 344 So. 2d 130, 132 (Miss.

6

1977). When a school board is acting in an adjudicatory capacity, the teacher must rebut this presumption by showing that the board members *had a personal or financial stake in the outcome of the decision or that there was some personal animosity toward the teacher*. *Spradlin*, 515 So. 2d at 898; *Dampier*, 344 So. 2d at 132.

*Id*. (emphasis added). Eichhorn argues that the Commission erred by not applying the Code of Judicial Conduct and, instead, employing the standard for recusal outlined in *Byrd*.[3]

¶15. In *United Cement Co. v. Safe Air for the Environment Inc.*, 558 So. 2d 840, 842-43 (Miss. 1990), the supreme court considered a party's challenge to the partiality of a hearing officer for the Mississippi Department of Natural Resources Permit Board. The supreme court concluded:

> Administrative hearings of the character involved here are not trials[,] and they are not governed by the same rules which apply in courts of law. *New South Communications v. Answer Iowa Inc.*, 490 So. 2d 1225, 1227 (Miss. 1986). Further, there is a presumption that the officers conducting the hearing and the members of the Board behave honestly and fairly in the conduct of the hearings and in the decision-making process. *Harrison County School Bd. v. Morreale*, 538 So. 2d 1196, 1202 (Miss. 1989). Absent some showing of personal or financial interest on the part of the hearing officer or evidence of misconduct on the officer's part, this presumption is not overcome. *Dampier v. Lawrence County School Dist*[.], 344 So. 2d 130, 132-33 (Miss. 1977); *Hortonville Joint School Dist*[.] *No. 1 v. Hortonville Educ*[.] *Assoc*[.], 426 U.S. 482, 496-97. . . (1976).

*Id*. The supreme court followed this standard in *Byrd*. More recently, in *Bourgeois v. City of Bay St. Louis Civil Service Commission*, 270 So. 3d 1039 (Miss. Ct. App. 2018), we

---

[3] In support of her claim, Eichhorn cites *Mabus v. Mueller Industries Inc.*, 205 So. 3d 677, 681-82 (¶¶13-18) (Miss. Ct. App. 2016), in which this Court considered a claimant's argument that "the AJ's comments conflict[ed] with Canon 3(B)(2) of the Mississippi Code of Judicial Conduct, which required the AJ's recusal." *Id*. at 681 (¶15). However, the question of the applicable standard for the AJ's recusal was never raised or challenged by the parties in that case.

addressed a similar argument to the one asserted by Eichhorn. A terminated government employee advocated that the standard of recusal for a Civil Service Commission member "should be the same as it is for judicial recusal—whether the commissioner's impartiality might be questioned by a reasonable person knowing all the circumstances." *Id*. at 1043 (¶9). Citing the supreme court's holdings in *United Cement* and *Byrd*, we rejected his claim, holding that the standard for recusal "is actually much more lenient." *Id*. at (¶¶9-10).

¶16. Therefore, we find no merit to Eichhorn's claim that the Commission's reliance on the standard for recusal in *Byrd* was in error as a matter of law, and we affirm the Commission's denial of the motion to recuse.[4]

> ## II. Whether the AJ erred in determining Eichhorn's "usual employment" and the percentage of her permanent partial disability.

¶17. The AJ noted in his findings that Dr. Geissler had assigned Eichhorn "a permanent impairment rating of 3% to the left upper extremity" and that the FCE had placed her on permanent restrictions, preventing her from "qualifying for the cashier job she previously held at Kroger because she is limited to twenty pounds lifting." The AJ further observed that because the "written job requirement calls for the employee to be able to lift [fifty] pounds, [Eichhorn] would not qualify for the position despite the fact that she may well be capable of performing the duties." Nevertheless, because she was able to return to work at Kroger as a "U-Scan" cashier, the AJ concluded that Eichhorn had "suffered a 15% of industrial loss

---

[4] Agreeing that recusal was not required here, the well-reasoned opinion by Presiding Judge Wilson implicitly relies on this standard in *Byrd*, noting that the chairman had "no direct pecuniary interest in this case[, nor were] there any other circumstances demonstrating a probability that the chairman was actually biased against Eichhorn."

8

of use of a scheduled member, her left upper extremity."

¶18.    Eichhorn requests on appeal that this Court reverse and render the Commission's findings and award her a 99% "loss of industrial use of her arm."  Kroger has filed a cross-appeal of the Commission's decision regarding the percentage of permanent partial disability, arguing that the AJ's decision "was clearly not supported by substantial evidence" and that Eichhorn "is only entitled to 3% permanent disability rating," as evidenced by the treating physician's report.

¶19.    Eichhorn asserts that with regard to a determination of her "usual employment," the AJ should have considered her past employment history.  In *Meridian Professional Baseball Club v. Jensen*, 828 So. 2d 740, 747 (¶20) (Miss. 2002), the supreme court considered "whether 'the job at the time of injury' is necessarily the 'usual employment.'" Addressing a line of prior cases, the supreme court concluded:

> "[U]sual employment" is broader in scope than the job held at the time of the injury, and narrower than "other employment[,]" as contained in [Mississippi Code Annotated section] 71-3-3(I) [(Rev. 2000)].[5] Usual employment in this context means the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.

*Id*.  The record clearly demonstrates that the AJ not only considered Eichhorn's job at the time of injury but also took into account the testimony of Kathy Smith and Pete Mills.  The AJ noted that without the accommodation by Kroger, Eichhorn would have "some loss of

---

[5] Section 71-3-3(i) (Rev. 2000) defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings."  This definition is unchanged in the current version of the statute.

9

access to other employment" and "at a lower rate of pay." Thus, we find no merit to Eichhorn's claim in this regard.

¶20. Further, addressing the percentage of permanent partial disability awarded, this Court noted in *Sampson v. MTD Products*, 225 So. 3d 541, 543 (¶8) (Miss. Ct. App. 2017):

> The measure of compensation in a workers' compensation claim where the claimant suffers a permanent functional impairment to a scheduled member depends on two factors: "(a) the degree of functional loss of use as demonstrated by the medical evidence, normally expressed as a percentage, and (b) the impact that the loss of function of the particular scheduled member has on the worker's ability to perform the normal and customary duties associated with her usual employment."

(Quoting *Robinette v. Henry I. Siegal Co.*, 801 So. 2d 739, 743 (¶8) (Miss. Ct. App. 2000)). In *Sampson*, the AJ determined that the claimant "had suffered a ten-percent industrial loss of use." *Id.* at (¶7). The Commission reversed the AJ's ruling, finding that the claimant "had only suffered a two-percent industrial loss of use, consistent with her permanent medical impairment rating." *Id.* In concluding that the Commission's decision was supported by "substantial evidence," we noted our prior holding in *Howard Industries Inc. v. Robbins*, 176 So. 3d 113, 115 (¶1) (Miss. Ct. App. 2015)), that "[a]n industrial-loss determination considers whether a loss of wage-earning capacity has occurred."

> Thus, while an injury that renders a worker unable to continue in the position held *at the time of injury* creates a rebuttable presumption of total industrial loss of the member, this presumption is subject to other proof of the claimant's ability to earn the same wages he received at the time of injury.

*Id.* at (¶1) (emphasis added). "It is the claimant's burden to establish her entitlement to compensation, and the question of the existence and extent of any permanent disability arising out of a work-related injury is a question of fact for the Commission to determine

based on the evidence before it." *Robinette*, 801 So. 2d at 743 (¶7).

¶21. We find the evidence does not support Eichhorn's claim that her percentage of permanent partial disability should have been 99%. As noted by the AJ, Eichhorn's permanent restrictions prevented her "from qualifying for the cashier job she previously held at Kroger because she is limited to twenty pounds [of] lifting." Although Hayes testified that cashiers do not have to lift over twenty pounds, Kroger's written job description for a cashier requires an employee to be able to lift up to fifty pounds. However, Eichhorn is able to perform substantial acts of her usual employment working as a "U-Scan" cashier. As a result, we can find no error in the AJ's determination that "there is no presumption of total industrial loss of use."

¶22. We further find no merit to Kroger's argument that Eichhorn's percentage of partial disability should reflect her three-percent impairment rating. As discussed, the AJ determined that had Kroger not accommodated Eichhorn, "she would have some loss of access to other employment." There was also credible evidence presented that had it been necessary for Eichhorn to find other employment, she would have done so "at a lower rate of pay" than what she was earning at Kroger.[6] Because the AJ's ruling is supported by substantial credible evidence, we find no error in the Commission's decision to adopt and affirm the AJ's findings on this issue.

### III. Whether the AJ erred in finding that apportionment was not applicable.

---

[6] While Eichhorn is earning more money than she was at the time of injury, her raise in October 2018 was pursuant to her union contract.

¶23.   In his ruling, the AJ concluded that "[a]pportionment does not apply since there was no showing of previous permanent impairment to claimant's left shoulder and the benefits awarded are not based on any other previous impairments she may have had to other parts of her body." Prior to 2012, the statute that governs apportionment in worker's compensation cases, Mississippi Code Annotated section 71-3-7 (Rev. 2011), provided in pertinent part:

> Where a preexisting physical handicap, disease or lesion is shown by medical findings to be a material contributing factor in the results following injury, the compensation which, but for this paragraph, would be payable shall be reduced by that proportion which such preexisting physical handicap, disease or lesion contributed to the production of the results following the injury.

In *Stuart's Inc. v. Brown*, 543 So. 2d 649, 655 (Miss. 1989), the Mississippi Supreme Court concluded that under section 71-3-7 (Supp. 1982), apportionment may not be ordered unless the preexisting condition causes "pre-injury occupational disability."[7]  However, in 2012, section 71-3-7 was amended to provide, "The preexisting condition does not have to be occupationally disabling for this apportionment to apply."  Miss. Code Ann. § 71-3-7(2) (Supp. 2012).

¶24.   Although Eichhorn raised the issue of the AJ's ruling on apportionment in her "Statement of Issues," neither party provided any substantive discussion or authority on this

---

[7] Citing *Stuart's Inc.*, the supreme court subsequently found in *Bolivar County Gravel Co. v. Dial*, 634 So. 2d 99, 105-06 (Miss. 1994), that medical testimony demonstrated a claimant's "pre-existing condition became fully occupationally disabling as the result of the natural progression of the disease[,] . . . making apportionment mandatory." *See also Peco Foods of Miss. Inc. v. Keyes*, 820 So. 2d 775, 779 (¶25) (Miss. Ct. App. 2002) (noting the AJ's reliance on *Stuart's Inc.* in finding that although claimant "had some prior hand pain dating back to 1992, [she] was not occupationally disabled prior to her work at Peco Foods").

issue beyond Kroger's arguments regarding causation.[8] Moreover, while this Court has noted the 2012 amendment to section 71-3-7 in subsequent cases, we have not contemplated its effect on the supreme court's ruling in *Stuart's Inc.* that the claimant's pre-existing condition must be "occupationally disabling" before apportionment may be ordered.[9] Therefore, we requested that the parties file supplemental briefing on the issue.

¶25.   Not surprisingly, Eichhorn contends that we should follow the precedent set forth in *Stuart's Inc.*, and Kroger claims that the 2012 amendment to 71-3-7(2) is clearly meant to overturn *Stuart's Inc*. legislatively.

¶26.   The supreme court has held that in seeking to determine legislative intent, we must first examine the language of the statute. *Pryer v. Gardner*, 247 So. 3d 1245, 1252 (¶12) (Miss. 2018) (citing *Lawson v. Honeywell Int'l Inc.*, 75 So. 3d 1024, 1027 (¶7) (Miss. 2011)). "[I]f the statutory language is plain and unambiguous, [our courts] will apply the plain

---

[8] Arguing against the AJ's ruling that Eichhorn suffered a fifteen-percent industrial loss of use, Kroger asserted that the findings "show[ed] that [she] suffers non-work-related problems that keep[] her from performing the cashier job." Kroger also noted that the FCE reported that Eichhorn "complained about pain in the neck, back[,] and her right shoulder."

[9] In *Leflore County Board of Supervisors v. Golden*, 169 So. 3d 882, 887-88 (¶¶16-18) (Miss. Ct. App. 2014), we acknowledged the 2012 amendment but applied the statute as it read prior to the amendment, finding *Stuart's Inc.* "controlling" for the purposes of that particular case. Likewise, in *Miller v. Johnson Controls*, 138 So. 3d 248 (Miss. Ct. App. 2014), we determined that because the claimant's injury occurred in 2004 and was "not occupationally disabling," it was "fully compensable *under the law as it existed at the time of the injury.*" *Id*. at 254 (¶28) (emphasis added) (citing *Stuart's Inc.*, 543 So. 2d at 655). More recently, in *Washington County Board of Supervisors v. Smith*, No. 2019-WC-01193-COA, 2020 WL 5525526, at *9 (¶¶50-51) (Miss. Ct. App. Sept. 15, 2020), this Court again noted the amended language concerning apportionment, but we remanded without any findings because the "AJ and Commission [had] failed to address this issue of apportionment or set off credit[.]"

meaning of the statute and refrain from applying principles of statutory construction." *Id*. (citing *Lawson*, 75 So. 3d at 1027 (¶7)). In this case, the Legislature added the sentence, "The preexisting condition does not have to be occupationally disabling for this apportionment to apply."

¶27. In Bradley & Thompson, *Mississippi Workers' Compensation Law* § 5:57 (2020), it was recognized that the 2012 amendment to the statute "is likely to affect the part of *Stuart's Inc. . . .* that says if the preexisting 'condition causes the employee to experience pre-injury occupational disability, apportionment may not be ordered.'"

> The sentence in the amendment can be taken as a legislative disavowal of the ruling on that set of circumstances [in *Stuart's Inc.*] even though the amendment's terminology is not otherwise in the statute. The main appeal of this interpretation is that the amendment uses the "occupational disability" terminology that is also used in that 1989 decision.

*Id*. However, the treatise further surmises:

> "Occupational disability" in the amendment likely means "incapacity to earn wages" as defined in Miss. Code Ann. § 71-3-3(I), and this would allow the affirmative defense to be asserted when there is evidence of a qualifying preexisting condition. In this respect, it relaxes the requirement for apportionment but does not mandate apportionment in every set of circumstances where there had been prior wage reduction. That is, the amendment does not entirely negate the relevance of there being no prior occupational disability.

We find the treatise's reasoning in both respects persuasive.

¶28. Nevertheless, as asserted by Eichhorn in her supplemental brief, "[s]ection 71-3-7(2) still requires that the preexisting condition be *shown by medical findings* to be a material contributing factor in the results following injury." (Emphasis added). Here, we find there was no medical evidence presented that Eichhorn had any pre-existing condition(s),

14

occupationally disabling or otherwise. At the hearing, Eichhorn testified that she had no other physical problems at the time of her injury preventing her from performing her job as a cashier. She had only noted experiencing some neck and back pain *after her injury* during the FCE. The only medical findings presented were by Dr. Geissler. In his deposition, Dr. Geissler testified that Eichhorn had no congenital problem with her left shoulder. He merely noted that repetitive motion could cause tendonitis and that Eichhorn had some mild osteoarthritis in her shoulder. *See Evans v. Cont'l Grain Co.*, 372 So. 2d 265, 270 (Miss. 1979) (noting that "[n]ormal degenerative actions accompanying age cannot be classified as a 'disease'" under the apportionment statute).

¶29. Thus, as the AJ ruled, there was "no showing of previous permanent impairment to claimant's left shoulder[,] and the benefits awarded are not based on any other previous impairments she may have had to other parts of her body." Finding the evidence supports the AJ's determination on this issue, which the Commission adopted, we affirm.

¶30. **ON DIRECT APPEAL: AFFIRMED. ON CROSS APPEAL: AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J.; McDONALD, LAWRENCE AND EMFINGER, JJ., JOIN IN PART. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**WILSON, P.J., CONCURRING IN PART AND IN RESULT:**

¶31. I concur in Part II of the majority opinion and in the result. I also concur that the Commission did not err by denying Eichhorn's motion to recuse the chairman, but I reach

15

that conclusion for different reasons than the majority. I do not join Part III of the majority opinion, which unnecessarily addresses issues that neither party raised on appeal.

## I. Recusal

¶32. Our Supreme Court has described the Commission as "a quasijudicial body that renders judicial decisions." *Johnson v. Sysco Food Servs.*, 86 So. 3d 242, 245 (¶8) (Miss. 2012). Indeed, the Supreme Court has held that the Commission is an "inferior court" that the Legislature created "[i]n a legitimate exercise of its constitutional authority." *Id.* at 246 (¶16) (citing Miss. Const. art. 6, § 172). As the Supreme Court explained, the cases that the Commission decides were "heard in courts under the common law." *Id.* at 245 (¶10). "The Legislature moved the venue of these suits . . . to the Commission," but they remain adversarial disputes between private parties, with the Commission acting as the fact-finder and judge. *Id.*

¶33. For these reasons, the Supreme Court has recognized that the Commission and the cases it hears are fundamentally different from typical administrative agencies and administrative proceedings. *Dialysis Solutions LLC v. Miss. State Dep't of Health*, 96 So. 3d 713, 717-18 (¶10) (Miss. 2012). For example, a Certificate of Need proceeding before the Department of Health essentially concerns an application to the State for "a permit to provide health-care services." *Id.* at 717 (¶10). It "is not necessarily adversarial" and may involve only the Department and the applicant. *Id.* Moreover, the procedure is a purely "statutory creation" that did not "exist[] at common law." *Id.* at 718 (¶10). In contrast, the Commission decides adversarial "personal-injury lawsuits" between private litigants—cases

16

that "would have been heard in the courts under the common law, until the Legislature validly delegated quasi-judicial power to the Commission." *Id.* at 717-18 (¶10). For this reason, workers' compensation cases are more akin to judicial proceedings than administrative proceedings, and the Commission is more like a court than an administrative board or agency.

¶34. Because the Commission is a "court" that "renders judicial decisions" in adversarial cases between private parties, *Johnson*, 86 So. 3d at 245-46 (¶¶8, 16), the commissioners should be required to adhere to the same recusal standards that apply in all other courts of this State. A judge is disqualified from serving in any case in which "a reasonable person," knowing all the facts and the circumstances, "*might* harbor doubts about the judge's impartiality." *Dodson v. Singing River Hosp. Sys.*, 839 So. 2d 530, 534 (¶15) (Miss. 2003) (quotation mark omitted) (quoting *Collins v. Joshi*, 611 So. 2d 898, 903 (Miss. 1992) (Banks, J., concurring)). A judge "must be vigilant" to avoid even "the *appearance* of impropriety" because the judiciary has a "duty to guard jealously 'the public's confidence in the judicial process.'" *Id.* at (¶16) (quoting *Collins*, 611 So. 2d at 903 (Banks, J., concurring)). The need to avoid even the appearance of impropriety is no less important in disputes between injured workers and employers than it is in any other type of case.

¶35. Nonetheless, our Supreme Court has held that the Workers' Compensation "Act does not contemplate that a commissioner shall disqualify himself *for any reason*." *Bruton v. Miss. Workmen's Comp. Comm'n*, 253 Miss. 694, 701, 178 So. 2d 673, 675 (1965) (emphasis added). Rather, according to the Supreme Court, "the Act apparently contemplates that *all*

17

*three commissioners must sit*, be the triers of fact, and hand down the necessary orders *in all*

*compensation cases*." *Id.* (emphasis added). In *Bruton*, the Court referred to the lack of a

provision for the recusal of the commissioners as an "apparent[] . . . hiatus in the

compensation law which the [L]egislature might possibly care to remedy." *Id.* at 703, 178

So. 2d at 676. But in the years since *Bruton* was decided, neither the Supreme Court nor the

Legislature has addressed the issue. Therefore, I conclude that under *Bruton*, all three

commissioners have an absolute duty to hear and impartially decide "all" cases that come

before them, *id.*, subject only to constitutional constraints.[10]

¶36.     Although no rule or statute provides for the recusal of a commissioner, due process

may still require recusal in some cases. "It is axiomatic that a fair trial in a fair tribunal is a

basic requirement of due process." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876

(2009) (quotation marks and brackets omitted). This means that although most recusal

motions do not raise constitutional issues, due process requires a judge to "recuse himself

when he has a direct, personal, substantial, pecuniary interest in a case." *Id.* (quotation marks

omitted). In addition, due process requires recusal when the circumstances would lead an

objective observer to conclude "that the probability of *actual* bias on the part of the judge or

---

[10] The specific problem in *Bruton* was that after one commissioner recused himself, the remaining two commissioners did not agree on the disposition of the case so that there was no majority decision of the Commission. *Id.* at 698, 178 So. 2d at 674. The Supreme Court remanded the case to the Commission with instructions to produce "a majority opinion of the full [C]ommission." *Id.* at 703, 178 So. 2d at 676. The opinion suggests that there is no reversible error in a commissioner's recusal so long as the remaining two commissioners can agree on a result. *See id.* 700-01, 178 So. 2d at 675. However, the larger point of the Court's opinion seems to be that the law makes no provision for recusal and that the commissioners therefore have a duty to sit in "all" cases. *Id.* at 703, 178 So. 2d at 676.

18

decisionmaker is too high to be constitutionally tolerable." *Id.* at 877 (emphasis added) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).[11]

¶37. In the present case, due process did not require the chairman's recusal. The chairman has no direct pecuniary interest in the case. Nor are there any other circumstances demonstrating a probability that the chairman is actually biased against Eichhorn. Therefore, I agree with the majority that the Commission did not err by denying Eichhorn's motion to recuse the chairman.

¶38. To return to my initial point, because the Commission renders judicial decisions as an "inferior court," its commissioners should be expected to adhere to the same recusal standards as judges. However, under the Supreme Court's decision in *Bruton*, the commissioners have a duty to sit in all cases, subject only to constitutional constraints. As the Supreme Court suggested in *Bruton*, the Legislature could address this gap in the law by providing a statutory procedure for the recusal of commissioners. *Bruton*, 253 Miss. at 703, 178 So. 2d at 676. Alternatively, given that the Supreme Court has now held that the Commission is an "inferior court" under our Constitution, *Johnson*, 86 So. 3d at 246 (¶16), the Supreme Court could amend the Code of Judicial Conduct to make its disqualification provisions applicable to the commissioners,[12] and the Chief Justice, with the advice and

---

[11] *But see id.* at 890-91 (Roberts, C.J., dissenting) (arguing that "a 'probability of bias' cannot be defined in any limited way" and "provides no guidance to judges and litigants about when recusal will be constitutionally required).

[12] In *Mabus v. Mueller Industries Inc.*, 205 So. 3d 677, 681-82 (¶¶13-18) (Miss. Ct. App. 2016), we appropriately applied the Code's disqualification provisions to an administrative judge of the Commission. For all the reasons discussed above, the Commission's administrative judges should adhere to the same recusal standard applicable

19

consent of the other justices, could then appoint special commissioners to hear cases in which a regular commissioner is disqualified. Miss. Code Ann. § 9-1-105(1) (Rev. 2019).

## II. Apportionment

¶39. Part III of the majority opinion addresses the finding of the administrative judge (AJ) that "[a]pportionment does not apply" in this case. In the course of addressing this issue, the majority also engages in a discussion and analysis of a 2012 amendment to Mississippi Code Annotated section 71-3-7(2) (Rev. 2011) and its effect on pre-2012 caselaw. I do not join Part III of the majority opinion because Kroger did not challenge the AJ's adverse finding on the issue of apportionment before the full Commission or before this Court. In addition, neither party raised this issue on appeal.[13] This Court generally does not address issues that neither party has raised on appeal. *See, e.g.*, *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018). Nor do we typically "second-guess" findings that the parties have not challenged. *In re Estate of Ladner*, 909 So. 2d 1051, 1056 (¶21) (Miss. 2004). There is

---

to other judges, and there is no practical or legal impediment to the recusal of a single administrative judge or the reassignment of the case to another administrative judge.

[13] The majority opinion states that "[a]lthough Eichhorn raised the issue of the AJ's ruling on apportionment in her 'Statement of Issues,' neither party provided any substantive discussion or authority on this issue beyond Kroger's arguments regarding causation." *Ante* at ¶24. However, Eichhorn did not include this issue in her mandatory statement of the issues presented for appellate review pursuant to Mississippi Rule of Appellate Procedure 28(a)(3). Rather, Eichhorn mentions this issue within a section of the body of her brief that is simply a near-verbatim copy of the brief she filed with the Commission. Eichhorn obviously did not challenge the AJ's finding on this issue. Nor did Kroger challenge the AJ's finding or brief the issue.

no reason to deviate from our usual rules in this case.[14]

## Conclusion

¶40. For the foregoing reasons, I concur in Part II of the majority opinion and in the result.

**McCARTY, J., JOINS THIS OPINION. McDONALD, LAWRENCE AND EMFINGER, JJ., JOIN THIS OPINION IN PART.**

**McCARTY, J., CONCURRING IN PART AND IN RESULT:**

¶41. I agree with the majority that the Commission was not wrong to deny the claimant's request to recuse a commissioner. I write separately for two reasons. First, the inherent legislative framework of the Commission belies the request for recusal. Second, I emphasize the correctness of our precedent applying the Canons of Judicial Conduct to the administrative judges of the Commission.

¶42. The unique architecture of the Workers' Compensation Commission does not support Eichhorn's claim that the commissioner is inherently biased. There are three commissioners. Miss. Code Ann. § 71-3-85(1) (Rev. 2011). One "shall be a person who by reason of his previous vocation or affiliation can be classed as a representative of employers, and one . . . member shall be a person who by reason of his previous vocation or affiliation can be classed as a representative of employees." *Id*. The third member "shall be an attorney at law of recognized ability with at least five (5) years' active practice in Mississippi prior to his appointment." *Id*. At the outset, the commissioners are explicitly drawn from different backgrounds in order to represent different views.

---

[14] I recognize that an order was entered directing the parties to file supplemental briefs on this issue. However, that order raised the issue sua sponte. The parties themselves did not raise the issue or challenge the AJ's finding.

21

¶43. A challenge to the constitutionality of this framework was considered over twenty years ago by the Mississippi Supreme Court. *See Warren v. Miss. Workers' Comp. Comm'n*, 700 So. 2d 608, 616 (¶¶35-36) (Miss. 1997). A plaintiff claimed that the system was biased against claimants for compensation. *Id*. at (¶35). The Supreme Court rejected the argument because "as a matter of logic, it would seem that any bias that results from the requirement of commissioners who can be classed as representatives of employers or employees would cancel itself out, since the statute requires one representative of each." *Id*. at (¶36). The Court ultimately found there was no evidence of bias "beyond [a] bare allegation that the adjudications have been biased because the Commission comprises people who can be classed as having represented employers or employees." *Id*.

¶44. In my view, it is only this unique framework of the Commission itself that leads to the conclusion reached by the majority. As Presiding Judge Wilson points out in his separate opinion, the Commission is "fundamentally different from typical administrative agencies and administrative proceedings," and therefore the reliance by the majority upon decisions from purely administrative cases is inapposite.

¶45. The Legislature's system for selecting commissioners further demonstrates why Eichhorn's invocation of one of our prior opinions is distinguishable. Eichhorn cites to precedent from this Court where we applied the Canons of Judicial Conduct in considering whether a recusal of an administrative judge at the Commission was warranted. *Mabus v. Mueller Indus. Inc.*, 205 So. 3d 677, 681-82 (¶¶13-18) (Miss. Ct. App. 2016). We properly applied the Canons to the administrative judge, as it is beyond dispute the administrative

22

judges of the Commission are subject to the Canons. *Id*.; *see* Miss. Code of Jud. Conduct Application A ("*Anyone*, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions . . . is a judge within the meaning of this Code") (emphasis added); *cf.* Miss. Code of Jud. Conduct Preamble (A "judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law").

¶46. Yet as set out above, the composition of the trio of commissioners is designed in part to "comprise[] people who can be classed as having represented employers or employees." *Warren*, 700 So. 2d at 616 (¶36). As a result, *Mabus* does not apply when one seeks recusal of a commissioner, but continues to fully apply if one seeks the recusal of an administrative judge from the Commission.

¶47. These matters, and the effort applied to best resolve them, are critical to our administration of justice since "[t]he role of the judiciary is central to American concepts of justice and the role of law." Miss. Code of Jud. Conduct Preamble. Mississippians are entitled to "[a]n independent and honorable judiciary," and that guarantee "is indispensable to justice in our society." Miss. Code of Jud. Conduct Canon 1. Accordingly, I respectfully concur in part and in the result.

**McDONALD, J., JOINS THIS OPINION IN PART.**